STATE of North Dakota, Plaintiff
and Appellee,

v.

Gary OLSON, Defendant and Appellant.

Cr. No. 630.

Supreme Court of North Dakota.

Dec. 6, 1978.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for defendant and appellant; argued by Irvin B. Nodland.

Mervin D. Nordeng, State's Atty., Fargo, for plaintiff and appellee.

PEDERSON, Justice.

After a three-week jury trial which was skillfully handled by experienced counsel and by an experienced trial judge who made obvious efforts to assure a fair trial, Gary Dean Olson was convicted by a jury of murdering his wife Dixie. Olson appealed, contending that errors by the trial court require a reversal and a new trial. The record, when considered as a whole, discloses that this was not a perfect trial—but it was a fair trial. We affirm the conviction. Olson further contends that he was sentenced to life imprisonment pursuant to an unconstitutional statute. We disagree.

The bludgeoned body of Dixie Olson was found by her children in her bed on the morning of January 24, 1977. Gary and Dixie were estranged and living separately. With the exception of the incriminating evidence which involves the alleged errors, the evidence was circumstantial. Two of the witnesses for the prosecution were convicted felons who were cellmates of Olson while he was held in a jail at Valley City awaiting trial. Their testimony is directly or indirectly involved in the first three issues.

1. *Newspaper publicity during trial.*

Approximately an hour and a half after the jury was impaneled, Judge Redetzke, the presiding judge, said: "Bearing in mind the Court's usual admonition, we will take a recess . . . ." This is the first admonition found in the record. Counsel did not object at this point, or at any other time, so as to afford the trial court the opportunity to supply the full admonition for the record. Olson argues that this court, in *State v. Julson*, 202 N.W.2d 145 (N.D.1972), approved this practice by the court, but only when the trial judge had given the fully required admonishment at the beginning of the term. In *Julson*, this court said:

"The practice in Judge Redetzke's court is that the judge makes this admonition to the entire jury panel at the beginning of the term, and follows that full admonition at appropriate times during the trial of a case with a statement to the jurors, 'Members of the Jury, bear in mind the Court's usual admonition.' The defendant has not shown that he has been prejudiced by the practice of Judge Redetzke's use of a short form of admonition. While it may be better practice to repeat the full admonition at each adjournment, we find that giving the admonition in short form was not prejudicial to the defendant. *Furthermore, the act complained of occurred during the trial and was not objected to by the defendant, and cannot, therefore, be now urged as error.*" [Emphasis supplied.] *State v. Julson*, 202 N.W.2d at 155, *supra*.

Olson ties his objection to the short-form admonition to an occurrence on the eighth day of trial when he moved for a mistrial because of articles that appeared in the newspaper the evening of June 14 and the morning of June 15, 1977. We note initially that the statutory admonishment (§ 29–21–28, NDCC) proscribes conversation among jurors or with others on any subject connected with the trial, and the formulation or expression of an opinion until the case is finally submitted. It is not likely that such an admonition in the specific language of the statute would have been interpreted by any juror as directly prohibiting the reading of the local daily newspaper. As in *Julson, supra*, we find no prejudice to Olson because of the short-form admonishment and conclude that his objection comes too late.

As viewed by the trial court and by this court, the newspaper articles raised "a very

serious situation." Both articles attributed some of the most critical testimony that had been presented at the preliminary hearing as having been received at the trial which was underway. Both articles reported that a cellmate had testified that Olson said he had ransacked his wife's home and dropped the murder weapon, a tire iron, in a river ice-fishing hole. The June 14 story was headlined, "Cell mate testifies in Olson murder trial," and proceeds: "Today in Cass County District Court defense counsel William Yuill questioned a cell mate's motives for wanting to testify against Gary Dean Olson." On June 15, a Wednesday, the reported article stated: "Earlier Tuesday, defense counsel William Yuill questioned a cell mate's motives for wanting to testify against the defendant." At this point in the trial, there had been no testimony from any cell mate.

A careful examination of both articles discloses statements contradicting the conclusion that this evidence was given at the trial, and there can be no question but that the jurors who read the newspaper articles knew for a fact that the cell mate had not testified. There is some indication that the writers of the news stories were negligently excerpting from stories that had been printed in the same newspaper at or about the time that the preliminary hearing had been conducted.

After he had heard Olson's mistrial motion and argument, the trial judge examined the jurors and discovered that four had read the news story. One of the four was the alternate juror. It is significant that we consider carefully the questions and answers at this point.

"THE COURT: . . . Now I'll take you one at a time, you, sir, number one in the back row, you said you read last night's paper?

"MR. HJELMSTAD: Yes.

"THE COURT: Can you state to the Court honestly, sincerely, whether or not that article had anything, had any effect upon your judgment and fairness in the trial of this case and did you accept any of the statements contained in that as being relevant to this trial?

"MR. HJELMSTAD: No, sir, I did not, absolutely not.

"THE COURT: And you, sir, number one in the front row, I ask the same question. Having read last night's paper, did that have any effect whatsoever on your judgment as a fair and impartial juror in this case with reference to the guilt or innocence of this man charged with murder?

"MR. HENDERSON: None whatsoever, I'm going just by what I hear here.

"THE COURT: All three of you, then, can swear to this court on your sacred oath that you are still fair and impartial jurors to determine the guilt or innocence of this man solely and wholly upon the evidence produced in court and not from any other source, how say you, sir, number one?

"MR. HJELMSTAD: Yes, sir.

"THE COURT: Number one in the front row?

"MR. HENDERSON: Yes.

"THE COURT: You madam, the alternate?

"MRS. ALBRIGHT: Yes, sir.

"THE COURT: Now, number five in the back row, you stated that you read this morning's paper. I ask you the same question, did that article in any way influence your capacity to judge this man's guilt or innocence fairly and impartially?

"MR. McCONNELL: No, sir.

"THE COURT: Has it in any way had any effect upon your judgment as a fair and impartial juror?

"MR. McCONNELL: No, sir.

"THE COURT: I will ask all of you that I have interrogated, can you state to the Court and to the defendant and to counsel, that you can still sit as fair and impartial jurors in this case uninfluenced by this publicity?

"MR. McCONNELL: Yes.

"MR. HENDERSON: Yes.

"MR. HJELMSTAD: Yes.

"MRS. ALBRIGHT: Yes."

Thereafter the court asked whether either counsel desired to question the jurors further. Defense counsel stated: "I think it's not necessary for us to inquire of the jury, Your Honor. I think the Court has made all the salient questions to them and received the responses I would wish." The court then denied the motion for mistrial and cautioned the media representatives present that he hoped and trusted that there would not be a repetition.

■ Although we are not bound by the trial court conclusion that the news articles did not interfere with the fairness and impartiality of the jurors who read them and that it did not constitute jury misconduct, we acknowledge that ordinarily "the matter must largely be left to the discretion of the trial court." *Langer v. United States*, 76 F.2d 817, 828 (8th Cir. 1935). The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). We said in *State v. Graber*, 77 N.D. 645, 44 N.W.2d 798, 803 (1950), that "the presumption is that the jury performed its duties in accordance with the law and were not influenced by any outside evidence," and in syllabus 3, at 799, "where no showing is made to the contrary that presumption prevails."

■ Constitutional standards of fairness require that a defendant have a panel of impartial jurors. In determining whether a defendant was deprived of a fair and impartial jury, the court will not readily discount the assurances of a juror as to his impartiality. It remains open to the defendant to demonstrate the actual existence of such an opinion in the mind of the juror to overcome a presumption of impartiality and raise a presumption of partiality. We are not involved here in a case where "trial atmosphere [is] utterly corrupted by press coverage," *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), or where the trial was conducted in a "circus atmosphere," *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), *reh. den.*, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d

118 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). See also *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), and *People v. Quinlan*, 8 Cal.App.3d 1063, 88 Cal.Rptr. 125 (1970). Courts look at the totality of circumstances to determine whether the trial was fair. On a pretrial review of an order denying a motion for change of venue, a defendant may well be in a position to urge that doubts be resolved in his favor. After trial and conviction, where the reasonable likelihood of prejudice has been refuted by voir dire examination, we give deference to the trial judge who has heard the responses made by the jurors.

■ In this case the "evidence of guilt" contained in the news articles was subsequently introduced by the testimony of the witnesses. We think that this is a very significant fact. What the consequences might otherwise have been, we are not required to determine. We note, however, that there is authority for the proposition that when significant facts not admitted in evidence are presented to a jury in news articles, there is a presumption that the news articles had an improper effect upon the jury's deliberation and were prejudicial to the accused. See Anno.: Jury—Facts Not Admitted in Evidence, 58 A.L.R.2d 556, and Anno.: Juror Reading Newspaper, 31 A.L.R.2d 417. A balancing is required which, in this case, readily favors the determination by the trial court that a mistrial was not necessary to assure a fair trial. We agree with the Supreme Court of Iowa:

"Prejudice would, of course, be apparent when testimony *which is later held to be inadmissible* is reported by the press in such a manner that it comes to the attention of the jurors during the trial." [Emphasis supplied.] *State v. Clough*, 259 Iowa 1351, 147 N.W.2d 847, 853 (1967). *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), relied upon by Olson, was a case in which the jurors received from a newspaper information which was specifically excluded from the evidence by the trial court. Those addi-

tional cases cited by Olson which involve pretrial change of venue issues must be distinguished on the ground that an entirely different scope of review is involved. See *Olson v. District Court*, 271 N.W.2d 574 (N.D.1978).

The case of *Coppedge v. United States*, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), cert. denied, 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961), cited by Olson, has many similarities to the instant case. It resulted in a reversal—and we think for a very significant reason it should not be followed here. In *Coppedge* there were questions about the adequacy of admonitions. During trial, newspaper articles describing events which took place in front of the jury, supplemented by information which obviously should never have been, and was not, heard by the jury, were read by several jurors. The news story accounts included statements made to the court by counsel explaining why certain witnesses refused to testify: "that Coppedge had once pistol-whipped Thompkin's brother," and by the prosecutor "that he thought Coppedge was a vicious criminal." As in the instant case, the trial judge in *Coppedge* interrogated the jurors. It was concluded that a "no" response meant that each of the jurors thought that he could ignore the news articles and bring in a fair verdict on the evidence only. The reversal was based upon inadequate admonition, inadequate interrogation of the jurors who had read the articles, and information in the articles which was not admissible and was devastating to defendant's cause. Those deficiencies are not present in this case.

We conclude that Olson has not shown prejudicial error on this question.

### 2. *Failure to suppress testimony.*

■ Arnold Wayne Neukom and Gary Dean Olson were cell mates in the jail at Valley City for a period of time before Olson's trial began. Neukom testified at the preliminary hearing concerning incriminating statements made to him by Olson. Neukom was cross-examined thoroughly at that time, particularly concerning his rela-

tionship to the police, and it was clearly established that Neukom hoped and expected that by being helpful to North Dakota authorities he would be relieved of pending charges in Minnesota. Later, Olson made a pretrial motion to suppress Neukom's testimony on the ground that the evidence was unlawfully obtained. Olson argued that Neukom was working for the police in questioning Olson, without giving the *Miranda* warning, and that this violated his right to counsel. The suppression motion was denied. During the trial, Olson objected to Neukom's testimony for the same reasons. The testimony was allowed.

We are asked on this appeal to determine, at best, upon conflicting evidence, whether Olson's relationship to the police brings him within the purview of the basic premise of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Massiah* held that self-incriminating statements deliberately and surreptitiously elicited from an indicted defendant, taken in the absence of counsel by police or an informant working as an agent of the police, are inadmissible.

Olson relies upon the following statements by Neukom as establishing that he questioned Olson as an agent of the police:

"I only had one short conversation with one of the investigators who was handling this particular case. A very brief conversation and—most of the conversation was, he just asked certain questions about me. And when he got done discussing myself as a person and background, he told me that, well, you know, what the score is, and let us know when you know something."

"I told him what information he would need and I would secure the information if possible."

The State, on the other hand, relies upon the following statements by Neukom as establishing that Neukom acted for his own benefit and not as an agent of the police:

"Q And each time you talked to Mr. Lyman he would send you back to try to secure more information, is that a fair statement?

"A No. He never sent me back at all."

"Q I want you to answer the question.

"A No. He never had me do anything. I acted on my own for my own interests.

"Q He told you, well, we are interested in learning about a weapon. We are interested in learning about clothing. We are interested in learning about another act, specifics. He never inquired about those things?

"A I am telling you he never inquired. I told him what information he would need and I would secure the information if possible.

"Q Did Mr. Lyman ever say, did he tell you about this thing, that thing, or another thing?

"A I related the conversations and the information that I had. They took it down as a matter of record.

"Q The law enforcement people never once in the several times you talked with them gave you an idea of what they wanted to learn?

"A No. They knew they didn't have to."

"Q So, you were actually running the ball game, is that right?

"A. Yes."

In *State v. Kaloustian*, 212 N.W.2d 843, 845 (N.D.1973), we said: "at the appellate level we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting . . . ." See also *State v. Moe*, 151 N.W.2d 310, 313 (N.D. 1967), and cases cited therein. The United States Supreme Court held in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), that "it is not for us to weigh the evidence or to determine the credibility of witnesses." Accordingly, we must view the evidence in the light most favorable to the verdict and, upon doing so, we find no evidence from which we can conclude that Neukom acted for the police. The instant case falls squarely within the refinement of the *Massiah* rule set forth in *United States ex rel. Milani v. Pate*, 425 F.2d 6 (7th Cir. 1970), *cert. denied*, 400 U.S. 867, 91 S.Ct. 109, 27 L.Ed.2d 107 (1970).

In *United States ex rel. Milani v. Pate, supra*, as here, there was strong testimony that the cell mate was not instructed by the police but was motivated by self-seeking purposes. Neukom became a confidant and jailhouse lawyer for Olson before any of Neukom's contacts with police. Olson's disclosures to Neukom apparently started when intoxicating liquor was smuggled into the jail and Olson became thoroughly intoxicated. Neukom's betrayal of confidences was not solicited by police. The admission of his testimony was not error.

3. *Endorsement of additional witness on Information.*

■ Lester J. Meddy, a fellow inmate of Olson and Neukom, contacted the office of the prosecutor by letter on May 31, 1977, eight days before the trial of Olson's case began, indicating that he had information pertinent to the case. Two days before trial Meddy agreed to testify at the trial and, on that date, the prosecutor gave defense counsel and the court the name of this witness and advised them that he intended to call him.

On June 15 the prosecutor moved for permission to endorse the name of Lester J. Meddy upon the information. The counsel for Olson strongly resisted, whereupon the court reserved its ruling pending an opportunity for defense counsel to consult with the prospective witness. After defense counsel had a private consultation with Meddy, the court permitted the endorsement of Meddy's name upon the information and Meddy was permitted to testify. Defense counsel was then permitted to delay the cross-examination from Friday morning until Monday morning in order to investigate further the testimony given.

Rule 7(g), NDRCrimP, provides:

"Names of Witnesses to be Endorsed on Indictment or Information.

"When an indictment or information is filed, the names of all the witnesses on whose evidence the indictment or information was based shall be endorsed

thereon before it is presented, and the prosecuting attorney shall endorse on the indictment or information, at such time as the court by rule or otherwise may prescribe, the names of such other witnesses as he purposes to call. A failure so to endorse the said names shall not affect the validity or sufficiency of the indictment or information, but the court in which the indictment or information was filed, upon application of the defendant, shall direct the names of such witnesses to be endorsed. No continuance shall be allowed because of the failure to endorse any of the said names unless such application was made at the earliest opportunity and then only if a continuance is necessary in the interests of justice." [Emphasis supplied.]

The statutory requirement to endorse witnesses' names upon the information dates back to 1890 in North Dakota. Section 2, Chapter 71, passed at the first session of the legislative assembly of this State, approved February 6, 1890, provided:

"All informations shall be filed in the district court of the county having jurisdiction of the crime or offense specified therein, by the state's attorney of the proper county, as informant, and during the term of the said district court held in and for such county, the state's attorney shall subscribe his name to the information and endorse thereon the names of all witnesses for the prosecution known to him at the time of filing the same; but other witnesses may testify on the trial of such cause in behalf of the prosecution thereof the same as if their names had been endorsed thereon." [Emphasis supplied.]

The language in the 1890 Act underlined above was eliminated by the enactment of § 47, Ch. 132, S.L. 1939, and the language now in Rule 7(g), NDRCrimP, which is underlined above, was substituted therefor. This court has considered, on only one occasion since the 1939 change, whether witnesses whose names are not endorsed on the information can be permitted to testify. We held that they could.

"If the defendant desires to have the names of other witnesses which the State may call, endorsed on the information, he may, under the above section, make application to the court and the court 'shall direct the names of such witnesses to be endorsed.'" *State v. Manning*, 134 N.W.2d 91, 95 (N.D.1965).

This appears to be the first application of Rule 7(g), NDRCrimP, by this court. We find that the trial court did not permit Meddy to testify until defense counsel had the opportunity to consult with the proposed witness. It appears that a short continuance was granted by the trial court in the interest of justice. It was a matter of discretion for the trial court. See *State v. Manning, supra*. The fact that Meddy's testimony was very supportive of the incriminating evidence testified by Neukom does not make the trial court's action an abuse of discretion.

Permitting Meddy to testify was not error.

### 4. *Constitutionality of § 12.1–32–09, NDCC.*

 Olson was sentenced as a dangerous special offender under the provisions of § 12.1–32–09, NDCC. He argues that the statute is an unconstitutional delegation of legislative authority to the executive branch. His argument is brief and unpersuasive.

In *State v. Ternes*, 259 N.W.2d 296, 300 (N.D.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978), we said in response to a challenge of the same statute upon the same grounds:

"Unless it clearly appears that the power delegated is legislative, it cannot be held to be an unconstitutional delegation of legislative authority."

See also discussion of constitutional issues in *State v. Wells*, 265 N.W.2d 239 (N.D. 1978).

The conviction and extended sentence are affirmed.

ERICKSTAD, C. J., and VANDE WALLE and SAND, JJ., and BURDICK, District Judge, concur.

BURDICK, District Judge, sitting in place of PAULSON, J., disqualified.