STATE of North Dakota, Plaintiff
and Appellee,

v.

Wayne HALVORSON, Defendant
and Appellant.

Cr. No. 933.

Supreme Court of North Dakota.

March 21, 1984.

As Amended April 10, 1984.

Tom P. Slorby, State's Atty., Minot, for plaintiff and appellee.

Phillip J. Brown, Bismarck, for defendant and appellant.

PEDERSON, Justice.

A jury found Wayne Halvorson guilty of murder, a class AA felony under § 12.1–16–01, North Dakota Century Code. He appeals from the judgment of conviction, and requests that the conviction be reversed and the case remanded for a new trial on the grounds that the trial court erred 1) in its instructions to the jury; 2) in limiting defense counsel's cross-examination; 3) in admitting certain tape recordings into evidence and allowing the jury to take the recordings and playback equipment into the jury room; and 4) in allowing the criminal information to be amended to add the names of twenty-two witnesses on the day of trial. We do not agree that the trial court committed reversible error and, accordingly, affirm the conviction.

Shortly before 1:00 a.m. on October 20, 1982, Halvorson went to his estranged wife Llana's residence in Minot. Finding the combination storm door locked from the inside, he proceeded to cut or tear a hole in the screen, break the glass and open the inside door with his key. At the time he was carrying a .38 caliber revolver and a .223 rifle. He left the revolver in the living room and, still carrying the rifle, entered Llana's bedroom, where he heard her telephoning the police and told her to hang up. He testified that when she did not comply, he leaned across to disconnect the phone and she started to get up from the bed, pushing him backwards and causing the rifle to discharge. Regardless of whether the shooting was accidental, as Halvorson claims, or intentional, as the

State contends, Llana was killed instantly by a bullet wound in the neck.

Dawn Inman, Llana's 13-year-old daughter from a previous marriage, was in the house when the shooting occurred. Dawn's bedroom and Llana's bedroom were connected by a bathroom with separate doors to each bedroom. Dawn testified that she could see into her mother's bedroom while sitting up in bed if both connecting doors to the bathroom were open. Dawn saw Halvorson enter Llana's bedroom, heard the shot and saw her mother fall to the floor, but did not see what actually happened when the gun discharged. Halvorson locked the doors to the house and entered Dawn's bedroom.

Law enforcement officers arrived at the home almost immediately after the shooting in response to Llana's emergency call. The police established telephone contact with Halvorson and continued that contact periodically throughout the night. These conversations were recorded and tapes of the conversations were received into evidence. At no time during the telephone conversations was Halvorson advised that any statements could be used against him or that he was entitled to the assistance of counsel. At 7:30 a.m. Halvorson allowed Dawn to leave the house to go to school. At approximately 10:30 a.m. Halvorson surrendered and was taken to the police station where he was advised of his rights.

Later that afternoon Halvorson gave a voluntary oral statement to Detectives Glibota and Hendrickson, who prepared a written memorandum of the statement immediately after the interview. Halvorson's testimony at trial differed from his statement, as testified to at trial by Detective Glibota. The written memorandum of Halvorson's statement was also received into evidence. The main issue for the jury to determine at trial was whether or not the shooting was intentional or accidental. The court instructed the jury on murder and on the lesser included offenses of manslaughter and negligent homicide. The jury deliberated for approximately four hours before returning a verdict of guilty of the most serious offense, murder.

The instruction on negligent homicide is not at issue on this appeal. Halvorson contends, however, that the court incorrectly instructed the jury on murder and manslaughter.[1] Halvorson did not technically object to the instruction, stating that, in light of the statutes, that probably was the only way the court could instruct the jury. Although this court generally cannot consider an alleged error raised for the first time on appeal, Rule 52(b), NDRCrimP does authorize us to notice an error if it infringes upon the substantial rights of the defendant. *State v. Trieb*, 315 N.W.2d 649, 654 (N.D.1982). Because the interest at stake is so great (i.e., the consequences of being convicted of murder rather than of manslaughter), we will review the allegedly offensive instructions pursuant to Rule 52(b), NDRCrimP.

The court's instructions on "SOME STATUTES INVOLVED IN THE ALLEGED OFFENSE" informed the jury that a person is guilty of murder under § 12.1–16–01 of the North Dakota Century Code if he: "1. Intentionally or knowingly causes the death of another human being; or 2. Willfully causes the death of another hu-

---

1. The offenses of murder and manslaughter are set forth at §§ 12.1–16–01 and 12.1–16–02, NDCC. Subsection 3 of § 12.1–06–01 deals with felony-murder. The charging language of the information relating to that subsection was deleted before the case was submitted to the jury. The pertinent portions of the murder and manslaughter statutes in effect at the time Halvorson was charged are:

"12.1–16–01. Murder. A person is guilty of murder, a class AA felony, if he:
1. Intentionally or knowingly causes the death of another human being;

2. Causes the death of another human being under circumstances manifesting extreme indifference to the value of human life; ... Subsections 1 and 2 shall be inapplicable in the circumstances covered by subsection 2 of section 12.1–16–02."

"12.1–16–02. Manslaughter. A person is guilty of manslaughter, a class B felony, if he: 1. Recklessly causes the death of another human being; ..."

man being under circumstances manifesting extreme indifference to the value of human life." The instruction then defined the terms "intentionally," "knowingly," "recklessly" and "willfully."

With the exception of "intentionally," the definitions are, for all intents and purposes, taken verbatim from § 12.1–02–02, NDCC, which sets forth culpability requirements for offenses under the criminal statutes. Under § 12.1–02–02, a person engages in conduct intentionally "if, when he engages in the conduct, it is his purpose to do so." The court's instruction on intentionally stated that a person engages in conduct *"Intentionally'* if, when he engages in the conduct, he knows or has a firm belief, unaccompanied by substantial doubt, that he is doing so, whether or not it is his purpose to do so." [Emphasis in original.] That definition is identical to the definition for "knowingly," a presumably inadvertent duplication.

The court then instructed the jury on the "ELEMENTS OF MURDER" as follows:

"With respect to the crime of Murder, the burden of proof resting upon the State is satisfied only if the evidence shows, beyond a reasonable doubt, the following elements:

1. That on or about the 20th day of October, 1982, in the City of Minot, Ward County, North Dakota, the Defendant:

(a) Did intentionally or knowingly cause the death of Llana Halvorson, *or*

(b) willfully caused the death of Llana Halvorson under circumstances manifesting extreme indifference to the value of human life.

"If the State has established the elements set forth in paragraph 1(a) or 1(b) above to your satisfaction beyond a reasonable doubt, then it will be your duty to find the Defendant 'guilty' of the crime of Murder as charged in the Information.

"If the State has failed to establish each and all of those elements to your satisfaction beyond a reasonable doubt, it

is your duty to find the Defendant 'not guilty' of the crime of Murder."

The court's instruction on "MANSLAUGHTER" directed the jury that only if they found the defendant "not guilty" of murder could they consider whether or not he was guilty of manslaughter. The instruction then defined manslaughter in the statutory language of § 12.1–16–02(1), NDCC, and repeated the definition of "recklessly" from § 12.1–02–02, NDCC. The instruction on "ELEMENTS OF MANSLAUGHTER" likewise directed the jury that before they could find Halvorson guilty of the class B felony of manslaughter, they would have to find beyond a reasonable doubt "that on or about the 20th day of October, 1982, in the City of Minot, Ward County, North Dakota, the Defendant did recklessly cause the death of Llana Halvorson."

■ Halvorson claims that the court incorrectly instructed the jury on the meaning of "intentionally" when it defined the elements of murder, but he does not specify any defect. We noted above the discrepancy between the statutory definition of "intentionally" and the court's instruction. It is obvious that the court incorrectly defined the term, but the error was clearly harmless and Halvorson himself does not seriously assert any prejudicial effect.

■ Halvorson's strongest argument is that the court essentially instructed the jury that it could find him guilty of murder under § 12.1–16–01, NDCC, even if it found his conduct to have been only reckless rather than intentional or knowing. He maintains that by adding the word "willfully" to the statutory language of § 12.1–16–01(2) the trial court erroneously interjected the element of recklessness, lowered the State's burden of proof of the offense of murder, and completely defeated the distinction between murder and manslaughter.

As support for his position that inserting "willfully" constitutes reversible error, Halvorson cites *State v. Skjonsby*, 319 N.W.2d 764 (N.D.1982). Halvorson inter-

prets *Skjonsby* as affirmatively holding that the term "willfully" does not belong in an instruction on the elements of murder.

Halvorson's interpretation misconstrues our holding in *Skjonsby*, which actually supports the State's position that "willfully" must be inserted pursuant to § 12.1–02–02(2), NDCC.[2] Unlike Halvorson, Skjonsby contended that the jury instructions were misleading because the trial court failed to specifically instruct the jury that the culpability requirement for murder or attempted murder under § 12.1–16–01(2) was "willfully." We held that the omission was not prejudicial when the instructions were read as a whole because the amended indictment, which contained the word "willfully" in the charge, was read as part of the instructions and the jury was further instructed that the State had to prove each and every element in the indictment to be true. *Skjonsby*, 319 N.W.2d at 774.

Halvorson also relies on the commentary to the Model Penal Code to buttress his argument that adding "willfully" results in an impermissible blurring of the distinction between the conduct required to sustain convictions for murder and for manslaughter. This reliance on the Model Penal Code is also misplaced.

The pertinent sections of the Model Penal Code definitions of murder and manslaughter are remarkably similar to the language used in §§ 12.1–16–01 and 12.1–16–02, NDCC.[3] The Model Penal Code uses "purposely" instead of "intentionally" when defining murder. Interestingly enough, the Model Penal Code uses "recklessly" in defining both murder and manslaughter. The distinguishing feature is that before reckless conduct will sustain a conviction for the more serious offense it must be done "under circumstances manifesting extreme indifference to the value of human life."[4] "Recklessly" is part of the statutory definition of "willfully" and the distinction between murder and manslaughter is maintained by the requirement that to sustain a murder conviction the conduct must be done "under circumstances manifesting extreme indifference to the value of human life."

We view Halvorson's challenge to the use of recklessness as a culpability requirement for both murder and manslaughter as somewhat analogous to previous challenges to our reckless endangerment statute.[5] We have held that the fact that "recklessly" was the culpability required for both the misdemeanor and felony convictions did not result in an unconstitutional denial of equal protection. The fact that

2. Section 12.1–02–02(2), NDCC, provides that "If a statute or regulation thereunder defining a crime does not specify any culpability and does not provide explicitly that a person may be guilty without culpability, the culpability that is required is willfully."

3. The relevant provisions of the *Model Penal Code and Commentaries (Official Draft and Revised Comments 1980)* are:
    "210.2 Murder
    "(1) Except as provided in Section 210.-3(1)(b), criminal homicide constitutes murder when:
    (a) it is committed purposely or knowingly; or
    (b) it is committed recklessly under circumstances manifesting extreme indifference to the value of human life. ...
        "210.3 Manslaughter
    "(1) Criminal homicide constitutes manslaughter when:
    (a) it is committed recklessly; or ...."

4. As noted in Comment 4 to § 210.3 of the Model Penal Code, the above language "de-

scribes a kind of culpability that differs in degree but not in kind from the ordinary recklessness required for manslaughter. Examples given in Comment 4 to Section 210.2 may add some texture to the notion of extreme recklessness, but ultimately this issue must depend on an assessment of blameworthiness by the trier of fact."

5. North Dakota Century Code § 12.1–17–03 defines the offense of reckless endangerment as follows:
    "A person is guilty of an offense if he creates a substantial risk of serious bodily injury or death to another. The offense is a class C felony if the circumstances manifest his extreme indifference to the value of human life. Otherwise it is a class A misdemeanor. There is risk within the meaning of this section if the potential for harm exists, whether or not a particular person's safety is actually jeopardized."

the culpability requirements were the same was irrelevant because the operative grading language (the phrase "the circumstances manifest his extreme indifference to the value of human life") provided "an understandable and distinct definition of what circumstances are necessary to bring the act within the felony offense." *State v. Hanson*, 256 N.W.2d 364, 368–69 (N.D. 1977).

■ Halvorson contends that the jury instructions were confusing and misleading, permitting the jury to convict him of murder even if it may have found facts sufficient only to justify a conviction of manslaughter. If we assume that the jury did not find that Halvorson intentionally or knowingly caused Llana's death, acceptance of Halvorson's contention requires us to totally ignore the fact that to convict him of murder the jury had to find not only that he willfully (which term includes recklessly) caused her death, but also that he did so under circumstances manifesting extreme indifference to the value of human life. The jury could not have considered the manslaughter instruction unless it found Halvorson not guilty of murder.

■ It is well settled that in determining whether a jury instruction is misleading, the instructions must be considered as a whole and when, taken as a whole, they correctly advise the jury as to the law, they are sufficient even if a portion standing alone may be insufficient or erroneous. *Skjonsby*, 319 N.W.2d at 774; *State v. Piper*, 261 N.W.2d 650, 656 (N.D.1977). We conclude that the jury instructions regarding the essential elements of the offense, taken as a whole, are clear and not misleading.

Halvorson raises three other issues which we will discuss in less detail. The first issue concerns the cross-examination of the State's witness, Detective John Glibota. The state's attorney objected to questions related to certain things Halvorson had said to Glibota during the custodial interview at the police station and the trial court sustained the objections. Halvorson's counsel asked Glibota if the defendant had stated whether Dawn was in the bed or off the bed when he (Halvorson) spoke to her after the gun discharged. Three other questions related to Halvorson's response when asked why he didn't go outside the house when he knew the police were there. The last question concerned Halvorson's statements that he had been drinking before the shooting incident.

Halvorson argues that limiting his cross-examination of Glibota in the manner specified above was "unquestionably prejudicial" because the questions related to material issues and involved statements made during the police interrogation. He claims that the testimony he sought to elicit had bearing on his state of mind and his intent with regard to the shooting. His major argument is that the limitation violated the general rule that once a witness testifies on direct examination to part of a transaction, declaration, conversation or writing, opposing counsel is entitled to bring out the rest on cross-examination, to the extent that it is relevant. He also contends that limiting his cross-examination violated his Sixth Amendment right to confrontation and his Fifth Amendment privilege against self-incrimination.

■ Halvorson would have us believe that whenever defense counsel is not allowed to fully cross-examine a witness concerning the entire conversation, the defendant is, in effect, forced to take the stand and testify to what was actually said, thereby exposing himself to complete cross-examination by the State and waiving his Fifth Amendment privilege. Nowhere does Halvorson assert that his sole reason for taking the stand was to correct the allegedly erroneous impression left by Detective Glibota. We find his Fifth Amendment argument meritless.

■ We next consider Halvorson's claim that he was denied his Sixth Amendment right to confrontation. While we have acknowledged that the opportunity to cross-examine witnesses is the primary means of safeguarding the right of confrontation, we have also stated that the

scope of cross-examination necessarily involves the trial court's discretion. *State v. Buckley*, 325 N.W.2d 169, 171–72 (N.D. 1982). Absent a showing of abuse of discretion, this court will not interfere with a trial court's ruling in discretionary matters. *Grand Forks Herald v. District Court, Etc.*, 322 N.W.2d 850, 853–54 (N.D.1982). The requisite showing has not been made in this case.

Halvorson further argues that the court erred by sustaining the State's objections on the grounds that the responses would have been self-serving or hearsay statements and urges us to find that the testimony should have been allowed under the "doctrine of completeness." The State, on the other hand, takes the position that the doctrine does not apply where it conflicts with the Rules of Evidence after those rules have been codified. We decline to address the question of the doctrine's applicability or demise since it is not controlling on the hearsay issue.

█ The evidence would not have been hearsay if it had been admitted not to establish the truth of the statement, but to establish Halvorson's state of mind. Rule 803(3), NDREv. Even if the trial court did err in excluding the testimony the error would be grounds for reversal only if it were prejudicial and inconsistent with substantial justice. *Klein v. Harper*, 186 N.W.2d 426, 434 (N.D.1971). Generally, the error is not prejudicial when the same or similar evidence is subsequently admitted. *Edwards v. McKechnie*, 62 N.D. 472, 243 N.W. 923, 925 (1932). In this case, the question relating to Dawn was asked again and answered without objection. Halvorson subsequently testified on direct examination concerning his state of mind and intent. Furthermore, Detective Glibota's written report containing the statements objected to was received into evidence.

█ Halvorson argues that allowing the written report into evidence only perpetuated the error and increased the prejudicial effect, but does not point out any inaccuracies or discrepancies between the written report and Glibota's testimony as was the situation in *State v. Hilling*, 219 N.W.2d 164 (N.D.1974). As we noted in *State v. Faul*, 300 N.W.2d 827, 833 (N.D.1980), the comments to Rule 52(a), NDRCrimP state that any error that does not affect the substantial rights of an accused shall be disregarded. In making that determination we must consider the entire record and the probable effect of the error in light of all the evidence. Our review of the record in this case reveals that the evidence objected to was admitted in one form or another during the course of trial. We cannot conclude that the trial court's rulings impermissibly limited Halvorson's cross-examination of Detective Glibota.

The second issue concerns the admission into evidence of approximately six hours of taperecorded conversations between Halvorson, various law enforcement officers, and his mother during the time Halvorson was in Llana's residence. Halvorson argues that the tapes should not have been admitted in the first place and that even if they were properly admitted, the tapes and playback equipment should not have gone to the jury room.

During the trial, Halvorson objected to the admission of the tapes, characterized as containing "rambling conversations on a variety of subjects," on the grounds that the conversations were irrelevant and thus inadmissible under Rule 402, NDREv, or that if relevant, the conversations were still inadmissible under Rule 403, NDREv, because their probative value was substantially outweighed by the risk of unfair prejudice. The trial transcript clearly shows that Halvorson's counsel had read transcripts of the tapes yet failed to object to any specific portions as being irrelevant or highly prejudicial. The court denied the motion to exclude the tapes as "not being timely made."

On appeal Halvorson asserts two other grounds, in addition to relevancy. Halvorson claims, for the first time, that the tapes contained damaging statements which violated his Fifth Amendment privilege against self-incrimination or, in the alternative, that the statements weren't voluntary

under the circumstances. He submits that the trial court confused relevancy with testimonial privilege and with the voluntariness of confessions or damaging statements made in response to police questioning, thus actually denying the motion under Rule 12(b)(3), NDRCrimP, which requires motions to suppress illegally obtained evidence to be made before trial. We disagree. While the trial court's choice of words was perhaps unfortunate, the record shows that it did consider relevancy and that one of the reasons the motion was "not timely" was that the State had no opportunity to edit the tapes "to eliminate the objections" where specific objections had not been made.

It appears that Halvorson is trying to have it both ways. In the trial court he objected to the admission of the tapes only on the grounds of relevancy or prejudice. At no time did he claim that the taped conversations were illegally or involuntarily obtained. Had he attempted to exclude the tapes on those grounds, as well as under Rule 403, and had the court denied his suppression motion as not being timely made, the situation on appeal might be different. Now, however, he claims that because he was never given any *Miranda*[6] warnings during the phone conversations, his right against self-incrimination was violated and that the court should have made a "separate and deliberate" determination of whether or not his statements were voluntary. In support of this contention he cites *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); and *State v. Kerns*, 50 N.D. 927, 198 N.W. 698 (1924).

These cases can be readily distinguished. *Jackson* challenged the New York procedure for determining the voluntariness of a confession. The trial court here never had an opportunity to determine voluntariness because the issue was never raised before it. A pretrial suppression hearing *was* held in *Lego*. The defendant there advanced the theory that evidence offered against a defendant at a criminal trial and challenged on constitutional grounds (which Halvorson did *not* do at the trial level) must be determined admissible by a reasonable doubt standard. The United States Supreme Court rejected that theory and said that without good cause, it was unwilling to expand the exclusionary rules "by erecting additional barriers to placing truthful and probative evidence before state juries and by revising the standards applicable in collateral proceedings." *Lego v. Twomey*, 404 U.S. at 488–89, 92 S.Ct. at 626–27. *Kerns* was decided in 1924, long before *Miranda* and other United States Supreme Court decisions refined the exclusionary rules. Furthermore, all these cases involved confessions or statements made in custodial situations.

■ Despite Halvorson's forceful argument that his constitutional rights were violated because he was never given *Miranda* warnings during the conversations, his argument is not persuasive. *Miranda* applies only when a defendant is in custody. *State v. Brown*, 341 N.W.2d 10, 16 (Iowa 1983). Halvorson had complete freedom to move about within the house. Although law enforcement officials initiated the phone calls, Halvorson had control of the conversations throughout the time in question because at any time he could hang up the phone, disconnect it, or refuse to answer. Halvorson makes no contention that he was in custody during the time the phone conversations occurred and on the record before us we find no basis for making such a determination.

■ Under the facts of this case, we conclude that the tapes were properly admitted. Having reached that conclusion, we also address Halvorson's contention that the court erred by allowing the tapes

---

**6.** In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court pronounced that persons arrested or detained had to be informed of their right to remain silent and of their right to have an attorney present before being questioned. These rights can be waived, but if they are not, any evidence obtained in violation of them is inadmissible.

and playback equipment to go to the jury room because of the danger that the tapes could be erased (the court's concern in *Franklin v. State,* 74 Wis.2d 717, 247 N.W.2d 721 (1976), which Halvorson cites as authority for his position) and because the jury would unduly emphasize the tapes. We find Halvorson's contentions without merit. The playback equipment used did not have the capacity to erase. Halvorson's argument that the jury overemphasized the tapes obviously fails because the jury deliberated approximately four hours and there were about five or six hours of tapes. We agree with the reasoning of those jurisdictions which have allowed recordings and slides, along with the mechanical equipment necessary to hear or view the exhibits, to go to the jury room once the evidence is properly admitted. See *State v. Poulos,* 230 Kan. 512, 639 P.2d 477 (1982); *Hampton v. State,* 569 P.2d 138 (Alaska 1977); *State v. Miller,* 248 N.W.2d 56 (S.D.1976); *State v. Reyes,* 209 Or. 595, 308 P.2d 182 (1957); *State v. Triplett,* 248 Iowa 339, 79 N.W.2d 391 (1956); *State v. Gensmer,* 235 Minn. 72, 51 N.W.2d 680 (1951).

■ Finally, Halvorson urges this court to fashion a rule that allowing the endorsement of additional witnesses on the information on the day of trial without making provisions to overcome potential or actual prejudice to the defendant constitutes a per se abuse of discretion. His argument is brief and unpersuasive and we decline to adopt such a rule.

■ Rule 7(g), NDRCrimP, governs which witnesses must be listed on indictments and informations. In *State v. Manning,* 134 N.W.2d 91, 95 (N.D.1965), we noted that § 29–11–57, NDCC (the statutory predecessor to Rule 7) only requires that the names of the witnesses *on whose evidence the information is based* be endorsed on the information when it is filed. [Emphasis added.] The defendant can move to have additional witnesses endorsed. The granting or denying of any motion relating to the endorsement is within the trial court's discretion, as is the granting of any continuance as a result of the addition of proposed witnesses. *State v. Olson,* 274 N.W.2d 190, 196 (N.D.1978).

■ This court recently discussed Rule 7(g) in *State v. Jungling,* 340 N.W.2d 681, 683–84 (N.D.1983), where we held that a rebuttal witness does not have to be endorsed on an information. In both *Jungling* and the instant case, the record does not reflect that the defendant applied to the court for an order requiring the State to disclose additional witnesses. The record in this case does reflect that Halvorson had actual notice of the proposed additional witnesses before trial and that no pretrial hearing was held because of conflicts with defense counsel's schedule. Furthermore, most of the proposed witnesses whose names were added to the information were foundation witnesses. Defendant did not object to the testimony of those additional witnesses who were actually called to testify and does not specify any instances of actual prejudice.' We conclude that the trial court did not abuse its discretion in allowing the amendment of the information.

There is no well-defined rule by which appellate courts can determine whether or not an alleged error committed by the trial court in a criminal action is prejudicial. As we commented in *Manning,* 134 N.W.2d at 99, the underlying rationale of reviewing criminal judgments "is not to determine whether the record is perfect, but to determine whether the defendant has had a fair trial under the law and whether his conviction is based on evidence establishing his guilt beyond a reasonable doubt." We have previously held that errors in the admission or exclusion of evidence and errors or defects in any rulings by the court are not grounds for setting aside a verdict unless refusing to do so would be inconsistent with substantial justice. *Matter of Estate of Knudsen,* 342 N.W.2d 387, 391 (N.D. 1984). After reviewing the record in this case we find nothing that requires us to disturb the jury's verdict.

The judgment of conviction is affirmed.

ERICKSTAD, C.J., and GIERKE, SAND and VANDE WALLE, JJ., concur.