STATE of North Dakota, Plaintiff and Appellee,

v.

Ed BONNER, Defendant and Appellant.

Cr. No. 1015.

Supreme Court of North Dakota.

Feb. 1, 1985.
As Corrected Feb. 20, 1985.

Tom P. Slorby, State's Atty., Minot, for plaintiff and appellee; argued by John P. Van Grinsven, III, Asst. State's Atty., Minot.

Tam J. Black, Minot, for defendant and appellant; argued by Tam J. Black, Minot.

ERICKSTAD, Chief Justice.

Ed Bonner appeals from a judgment of conviction entered by the district court pursuant to a jury verdict finding him guilty of the crime of being an accomplice and/or co-conspirator to the delivery of a controlled substance. We affirm.

A review of the evidence presented to the jury reveals that in early November 1982 Louis Long and Robert Jenkins met for the first time in a Minot bar. Long testified that Jenkins offered at that time to sell him some marijuana at a price of $300 per pound. Long expressed interest in such a transaction, provided he could come up with the money. Jenkins told Long that he could be reached through Ed Bonner, with whom Long was acquainted. Long met with both Jenkins and Bonner later in the day at a different bar. A discussion ensued as to the possibility of Long acquiring some "stuff" from Jenkins. As to Bonner's participation in the discussion regarding the "stuff," Long testified: "I think I asked him [Bonner] if he could get it and he nodded his head, 'Yes.'" Subsequently, Long agreed to participate with the Minot Police Department in an attempt to purchase marijuana from Jenkins.

On November 7, 1982, Long went to a rooming house owned by Bonner, where Bonner, Jenkins, and others resided. Long testified that he was advised by Bonner that the price of the marijuana would be only $200 per pound. On November 8 Long met with Jenkins outside the Bonner residence where arrangements were made for Long to "pick up" some marijuana the following day.

On November 9 Long met with Officer Wolf and Detective Knoop of the Minot Police Department, and was introduced to Agent Pat Geary, who was going by the name of Patrick LaFrombois. Agent Geary was provided with $250 and thereafter accompanied Long in Long's pickup truck to the Bonner residence. Long introduced Geary to Jenkins in the pickup. Jenkins brought out from under his coat a transparent plastic bag containing marijuana, which he transferred to Geary in exchange for $200. Geary also paid Jenkins an additional $50 in partial payment for another bag of marijuana. Long observed Jenkins retrieve the second bag from a shed behind the Bonner residence. Geary testified that he and Jenkins then made arrangements for the transfer on the following day of ten additional pounds of marijuana.

On November 10 Geary was provided with $2,050 and fitted with a microphone and transmitter. Geary proceeded alone, under police surveillance, to the Bonner residence where he discussed the scheduled transaction with both Jenkins and Bonner. Jenkins told Geary that he had not been able to come up with ten pounds of marijuana, but that he had anywhere from five to seven pounds available. Geary testified as to the extent of Bonner's involvement in the discussion:

"I believe I stated to the people there, Mr. Bonner and Mr. Jenkins, there was no way I was going to pay $2,000 for 5 to 7 pounds when it was agreed upon I was going to get 10 pounds. Mister Bonner and Mr. Jenkins both stated the quality of the marijuana was exceptional. I believe Mr. Bonner also stated that they would be getting some more later on during the week and that that there, again, would be better quality marijuana.

"I asked Mr. Bonner at this time if the marijuana I was indeed purchasing was home grown, and Mr. Bonner stated, 'No, it is very good quality marijuana.'"

According to Geary, Bonner told him that the marijuana of November 10 was better than that purchased by Geary on November 9. Bonner also stated to Geary that he should be very happy with the quality of the marijuana and, if he was not, "to return it to him [Bonner] and he would take care of it."

Geary testified that he told Jenkins and Bonner to bring the marijuana to his vehicle. Jenkins momentarily left the scene while Geary talked briefly with Bonner on the front porch. Geary returned to his vehicle. Within minutes Jenkins, who was carrying a small suitcase, and Bonner ap-

proached and entered Geary's vehicle. Geary paid Jenkins $50 owed on the transaction of the previous day. Geary testified: "Mr. Bonner again mentioned the fact that this was extremely good marijuana. We haggled over the price, I believe, a little more.... The marijuana was handed to me by Mr. Jenkins." Geary then recited a code word which resulted in the arrival of police officers who placed both Bonner and Jenkins under arrest.

Detectives Knoop and Glibota testified that they conducted surveillance of the transaction in a motor home parked in the vicinity of the Bonner residence. A receiver was utilized to monitor the conversation transmitted by Geary. Although the detectives were not able to hear clearly all the conversation that was had, both testified that they heard Bonner tell Geary: "If you don't like this, come back later and we will have some more."

Bonner denied at trial having been involved in the November 10 transaction. He testified that he did speak briefly with Geary about the name that Geary was going by. Bonner explained that, because he thought he knew Geary, he kind of whispered to him "that if he got anything, I don't know if it's any good." Bonner testified that he went out to Geary's car to inquire if Geary knew a LaFrombois who had sold him a stolen pickup and, within seconds, was placed under arrest. Jenkins also testified that Bonner was not involved in the transaction.

On appeal Bonner raises essentially three issues.

## I.

Bonner contends that the trial court erred in allowing "co-conspirator" language to be contained in the amended information and jury instructions. The State concedes that there was some confusion on its part over the proper application in this case of our accomplice statute, particularly subsection (c) of Section 12.1–03–01(1), N.D.C.C. Accomplice liability is defined in Section 12.1–03–01(1), as follows:

"1. A person may be convicted of an offense based upon the conduct of another person when:

a. Acting with the kind of culpability required for the offense, he causes the other to engage in such conduct;

b. With intent that an offense be committed, he commands, induces, procures, or aids the other to commit it, or, having a statutory duty to prevent its commission, he fails to make proper effort to do so; or

c. *He is a co-conspirator and his association with the offense meets the requirements of either of the other subdivisions of this subsection.*

...." [Emphasis added.]

Criminal conspiracy is defined in Section 12.1–06–04: "1. A person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy." Subsection (5) of Section 12.-1–06–04 reads: "Accomplice liability for offenses committed in furtherance of the conspiracy is to be determined as provided in section 12.1–03–01."

The original information dated June 30, 1983, charged Bonner alternatively under Sections 12.1–03–01, and 12.1–06–04, as an accomplice or co-conspirator to the delivery of a controlled substance. The State moved to amend the information during trial to charge the "one" offense of "Accomplice and/or Co-conspirator to Delivery of a Controlled Substance." An amended information dated January 25, 1984, charged that Bonner, "in the capacity as a co-conspirator, ... willfully caused, commanded, induced, procured, or aided" Robert Jenkins in delivering marijuana on or about November 10, 1982, in violation of Sections 12.1–03–01, 12.1–06–04(5), and 19–03.1–23(1)(b), N.D.C.C. The State argued it was "eliminating the conspiracy" and charging Bonner under subsections (a), (b), *and* (c) of Section 12.1–03–01(1). Bonner's trial attorney, Phillip J. Brown, argued against any reference in the information to

a conspiracy if it was not being charged, but noted the matter was an issue to be resolved in the trial court's final instructions to the jury. There being no objection, the court permitted the amendment to the information.

Bonner's trial attorney thereafter submitted a proposed jury instruction defining accomplice liability which made no reference to a "co-conspirator" or Section 12.1-03-01(1)(c). The proposed instruction was rejected by the trial court in favor of an instruction which recited verbatim the statutory authority cited in the amended information, including Sections 12.1-03-01(1)(c), and 12.1-06-04(5). The amended information was also included in the trial court's instructions. No instruction was given regarding the essential elements of the crime of conspiracy. Bonner's trial attorney took exception to what he perceived was a problem with the language of Section 12.1-03-01(1)(c).

Bonner asserts that the jury was misled and confused by the inclusion of "co-conspirator" language in the amended information and the jury instructions. He argues he was "labeled a co-conspirator" without the State meeting its burden of proving that the crime of conspiracy was committed.

 In determining whether a jury instruction is misleading, the instruction as a whole must be considered. If, when considered as a whole, the instruction correctly advises the jury as to the law, it is sufficient even if a part of the instruction standing alone may be insufficient or erroneous. *State v. Halvorson,* 346 N.W.2d 704, 709 (N.D.1984); *State v. Skjonsby,* 319 N.W.2d 764, 774 (N.D.1982). If a jury instruction, when read as a whole, is erroneous, relates to a subject central to the case, and affects the substantial rights of the accused, it is ground for reversal. *State v. Reich,* 298 N.W.2d 468, 471 (N.D.1980).

 The record reveals that the parties and trial court were aware at trial of this Court's decision in *State v. Lind,* 322 N.W.2d 826 (N.D.1982), in which the pur-

pose of Section 12.1-03-01(1)(c) is clearly stated:

"Section 401(1) of the proposed Federal Criminal Code is virtually identical in all material respects to Section 12.1-03-01(1), N.D.C.C. The comment in the Study Draft states that subsection (1)(c) of the proposed Federal Criminal Code rejects the doctrine of *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that 'mere membership in a conspiracy creates criminal liability for all specific offenses committed in furtherance of the conspiracy.' Study Draft of a New Federal Criminal Code, p. 30.... *The purpose of the language of Section 401(1) of the proposed Federal Criminal Code and Section 12.-1-03-01(1) is to renounce any rule that a co-conspirator is automatically an accomplice to any other crime committed in furtherance of the conspiracy.*

"Section 12.1-03-01(1) does not automatically make a co-conspirator an accomplice to a crime committed in furtherance of the conspiracy.... The North Dakota Criminal Code is consistent in its separate treatment of co-conspirators and accomplices, as evidenced by Section 12.1-06-04(5).... The definition of "accomplice" in Section 12.1-03-01(1)(a) and (b), specifies acts different from those set forth in the definition of 'criminal conspiracy' in Section 12.1-06-04(1)."

*Id.* at 841-42 [Emphasis added.]

It is readily apparent from our discussion in *Lind* that the existence of a conspiracy or the defendant's status as a co-conspirator does not constitute an essential element to accomplice liability.

The State apparently did not charge Bonner with the crime of conspiracy; therefore, we believe the inclusion of Sections 12.1-03-01(1)(c), and 12.1-06-04(5), in the trial court's jury instructions and the "co-conspirator" language in the amended information were unnecessary. However, when read as a whole, the instructions still required that the jury conclude beyond a reasonable doubt that Bonner violated either subsection (a) or (b) of Section 12.1-

03–01(1), prior to its returning a verdict of guilty. In our view these instructions, which recited verbatim the statutory definition of accomplice liability, did not incorrectly advise the jury as to the law.

## II.

Bonner contends that he was denied his right to a fair and impartial jury. The jury which tried this case was selected and sworn on November 30, 1983. On that day the State presented its opening statement and completed its direct examination of Louis Long. The following day, December 1, 1983, Bonner's trial attorneys, William Teevens and Kent Johnson, moved to withdraw as Bonner's counsel for ethical reasons not expressly made known to the trial court.[1] The court granted the motion and continued the trial to January 25, 1984, to enable Bonner to obtain new counsel. The jury was told that a motion "made by defense counsel ... necessitates a delay in this trial," that such delays are not uncommon and that the jury should not concern themselves with it. The trial court then clearly admonished the jury that they were not to listen to news accounts of the trial, nor were they to discuss the case among themselves or with anyone else, or allow anyone to discuss the case in their presence.

On January 25, 1984, Bonner's new counsel, Phillip Brown, brought to the attention of the court a newspaper article concerning the trial delay published December 1, 1983, in the *Minot Daily News*. Brown requested that the court ascertain whether or not the jury was influenced by the article. The trial resumed as follows:

"THE COURT: Ladies and gentlemen of the Jury, previous counsel for Mr. Bonner, the Teevens, Johnson and Montgomery firm, found they were unable to proceed in this matter as defense counsel, so at this time Mr. Bonner is represented by Mr. Phillip Brown of Bismarck....

"I would ask the jurors, any juror, if anyone engaged them in a conversation regarding this trial. (Jurors shake heads, negative responses.) Have any of you read news accounts of this Bonner matter since you were seated as jurors? (Jurors shake heads, negative responses.) Has anybody seen or heard a radio or television account of any kind whatsoever concerning this trial or the continuation of this trial? (Four jurors raise their hands.) I will ask you first.

\* \* \* \* \* \*

"JUROR: This morning on the radio. It gave the location of the trial, that's all.

\* \* \* \* \* \*

"THE COURT: I guess everybody heard the same news account. I heard it on television last night and it mentioned this trial would continue today before the Honorable Jon R. Kerian and it would be in the Federal Courtroom. Is that what you heard? (Jurors nod heads, affirmative responses.) Did anybody hear any newscasts? Anything different? I am not aware of any, but did anybody hear any news accounts that had any other substance to it in connection with this trial? (Jurors shake heads, negative responses.) All right, Mr. Van Grinsven, you may proceed."

Based on these circumstances, Bonner has raised the following issue: "Did the trial court deny the defendant his right to a fair and impartial jury by allowing the same jury to hear the defendant's case after a 55-day delay, especially when the jury had two prejudicial issues to speculate about—(1) the reason for Teevens' and

---

**1.** Attorney Teevens informed the trial court that the withdrawal was necessitated by "a completely diverse opinion [between counsel and Bonner] on issues that are primary to this case and how they can be dealt with.... It is much more than just a matter of a difference of opinion, it is a matter that does not allow Mr. Johnson and myself to continue without making a gross violation of our ethical code."

Johnson's withdrawal as counsel, and (2) the prejudicial newspaper article ...?"

■ The constitutional standard of fairness requires that a defendant have a panel of impartial and indifferent jurors. *State v. Voeller*, 356 N.W.2d 115, 118 (N.D.1984). We have carefully examined the record in this case and conclude that Bonner's trial was fundamentally fair.

### 1. *Withdrawal of counsel.*

■ On this point, Bonner cites no authority to support his position that "[s]ince no real reason was given for the delay and change of counsel, the jury speculated on one. This speculation prejudiced the defendant." Although we agree that the change of counsel during trial presented an unusual situation, there was no reason for the trial court to assume that any of the jurors had disregarded the admonishment given by the court not to concern themselves with this aspect of the case.

### 2. *Newspaper publicity during trial.*

Bonner asserts that the newspaper article prejudiced him because it associated him with Robert Jenkins, *i.e.*, that Jenkins used the same address as Bonner and that Jenkins was convicted and is serving time in the State Penitentiary.

In *State v. Olson*, 274 N.W.2d 190 (N.D. 1978), newspaper articles were published on the eighth day of trial which attributed some very critical testimony that had been presented at the defendant's preliminary hearing as having been received at trial when in fact, at that point in the trial, it had not. Upon the defendant's motion for a mistrial, the trial court examined the jurors and discovered that four of them had read the articles. The court then questioned the four jurors who indicated that the articles they had read had not influenced their capacity to determine, as fair and impartial jurors, the guilt or innocence of the defendant solely upon the evidence produced in court. In upholding the trial court's determination in *Olson* that a mis-

trial was not necessary to assure a fair trial, we found very significant the fact that the preliminary hearing testimony contained in the newspaper articles was subsequently introduced at trial through the testimony of witnesses.

■ In the absence of contrary evidence, a presumption exists that a jury performed its duties in accordance with the law and was not influenced by outside events or evidence. *State v. Ohnstad*, 359 N.W.2d 827, 842 (N.D.1984); *State v. Voeller, supra*, at 121; *State v. Olson, supra*, at 193. In this case, not only did the jurors indicate that they had not read the newspaper article, but the material contained in the article was introduced at trial by the testimony of witnesses. We conclude that Bonner has failed to show how he was prejudiced by the newspaper article.

### 3. *Trial delay.*

Bonner asserts that the delay itself prejudiced him because "the jurors were allowed to roam at large for 55 days with the State's side of the story in their minds," citing *People v. Dinsmore*, 102 Cal. 381, 36 P. 661 (1894), and *People v. Logan*, 123 Cal. 411, 56 P. 56 (1899).

In *Dinsmore, supra*, "an exceptional case," it was held an abuse of discretion for the trial court to discharge the jury for sixty-three days, on motion by the State and against the objection of the defendant, for the purpose of continuing the testimony of a witness who had become ill, where the situation was occasioned by no fault or act of the defendant and where the defendant was charged with a "peculiarly aggravated" offense (rape) which was "well calculated to arouse the feelings and passions of the people of the surrounding country." In *Logan, supra*, a case involving the alleged rape of a young girl, it was held that the trial court properly refused to continue a trial for two months, prior to the introduction of any evidence but after the jury was impaneled, on the ground of the illness of a

witness. The court, citing *Dinsmore,* said that the granting of such a continuance would have been reversible error.

 A trial court's decision whether or not to continue a criminal trial is a discretionary act. *State v. Larson,* 253 N.W.2d 433, 435 (N.D.1977); § 29–19–03, N.D.C.C.; Rule 50, N.D.R.Crim.P. It is also within the discretion of the trial court to permit the jury to separate during trial. § 29–21–27, N.D.C.C.; *State v. Glass,* 29 N.D. 620, 151 N.W. 229, 232 (1915). For separation to constitute reversible error there must be an objection supported by an affirmative showing that the defendant was prejudiced because of the separation. *State v. Bergeron,* 340 N.W.2d 51, 59 (N.D. 1983). No case involving circumstances identical to this case has been cited by either party. In most cases, however, where the trial court has permitted the jury, under proper admonitions, to separate during long periods during which the trial was postponed or continued, the defendant has been denied relief because of such separation, either because the court had authority to permit the separation, or the defendant failed to establish prejudice. Annot., Separation of Jury During Trial, 72 A.L.R.3d 131. *E.g., Packwood v. State,* 244 Ind. 585, 193 N.E.2d 494 (1963).

 In the instant case, the court admonished the jury, prior to separation, to avoid activity that might affect its impartiality. There has been no showing of the occurrence of any event or circumstances during the prolonged separation capable of prejudicing the deliberative function of the jury. Furthermore, no objection was made at trial by attorney Brown to the delay itself. In fact, in requesting that the court poll the jury concerning the newspaper article, Brown said: "If we have a good jury, I don't want to knock out a good jury, . . . ."

Bonner's own conduct necessitated the withdrawal of his counsel. *See* n. 1, *supra.* We believe that the trial court's decision to delay the trial as a result of the withdrawal

struck an appropriate balance between Bonner's right to adequate representation of counsel and a fair trial, and the possibility of jury prejudice and the public interest in the prompt and efficient administration of justice.

Considering the totality of circumstances, we cannot say that Bonner has demonstrated the existence of prejudice in law or fact on this issue. The trial court was acting within its discretion when it proceeded to trial with the same jury.

### III.

 Bonner contends there was insufficient evidence to support a finding that he was an accomplice to Jenkins in the November 10 transaction. Much of his argument for reversal on this ground proceeds from the assumption that his trial testimony concerning the events of November 10 was true. However, under our standard of review in cases challenging the sufficiency of the evidence, we must assume the jury believed the evidence which supports the verdict and disbelieved any contrary or conflicting evidence. We look only to the evidence most favorable to the verdict and the reasonable inferences which may be drawn therefrom to determine if substantial evidence exists to warrant the conviction. *E.g., State v. Voeller, supra,* at 118; *State v. Manke,* 328 N.W.2d 799, 806 (N.D.1982).

Sections 19–03.1–23(1)(b) and 19–03.1–15(4)(*o*), N.D.C.C., render it unlawful for any person to deliver marijuana. " 'Deliver' or 'delivery' means the actual, constructive, or attempted transfer from one person to another of a controlled substance. . . ." § 19–03.1–01(6), N.D.C.C. In *State v. Pronovost,* 345 N.W.2d 851, 853 (N.D.1984), we discussed accomplice liability as it is defined in Section 12.1–03–01:

"We have said that mere presence at the scene of a crime is not enough to make one an accomplice. However, presence at the scene of a crime is a fact which, together with other facts, may support a

finding that the defendant acted as an accomplice. *Zander [v. S.J.K.*, 256 N.W.2d 713, 715 (N.D.1977)].... Additional facts which would support a finding of accomplice liability include ... acting with the kind of culpability required for the offense and sharing the criminal intent of the principal; [or] approving the criminal act by active participation in it or by, in some manner, encouraging it; ..."

The testimony of the State's witnesses reveals that on November 10 Bonner actively participated in attempting to persuade Geary to purchase the marijuana, by essentially guaranteeing its quality. Bonner denies any such involvement. It was for the jury to determine who was telling the truth. The jury's verdict indicates that it chose not to believe Bonner. In viewing the evidence in a light most favorable to the verdict, we conclude that there was substantial evidence reasonably tending to prove Bonner's guilt and warranting his conviction.

The judgment is affirmed.

VANDE WALLE and GIERKE, JJ., and PEDERSON, Surrogate Justice, concur.

Surrogate Judge PEDERSON participated in this case by assignment pursuant to § 27–17–03, N.D.C.C.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.