1998 SD 6

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Michael Lee SMITH, Defendant and Appellant.**

**No. 19744.**

Supreme Court of South Dakota.

Considered on Briefs Dec. 4, 1997.

Decided Jan. 14, 1998.

Mark Barnett, Attorney General, Timothy Bartlett, Assistant Attorney General, Pierre, for plaintiff and appellee.

Gary W. Conklin of Galland Legal Clinic, Sioux Falls, for defendant and appellant.

PER CURIAM.

[¶ 1] Michael Lee Smith appeals from a judgment of conviction for accessory to murder and conspiracy to commit murder. We affirm.

### FACTS & PROCEDURE

[¶ 2] Smith and four co-defendants conspired to commit murder and carried out their plan to completion on July 9, 1995. Co-defendant Robert Power offered Smith $10,-000 or two pounds of methamphetamine to commit the murder of Mary Kay Ross. Smith declined but agreed to find someone for Power who would be willing to kill Ross. Smith introduced Power to two of the co-defendants. Smith agreed to handle the payment for Power and was to receive $1500 to $2000 for his services. Power gave Smith a key to Ross' apartment and a map of its floor plan and indicated the murder needed to take place the weekend of July 9, 1995, when Power's wife would be out of the state. Smith did not participate in the murder act itself but assisted in the destruction and concealment of evidence thereafter.

[¶ 3] On August 1, 1995, Smith provided two videotaped interviews to police which corroborated the version of the murder and the planning leading up to it given by his co-defendants and three other State witnesses. These video tapes were admitted into evidence, following denial of Smith's motion to suppress, with all references to prior convictions, probation, probation officers, and the penitentiary deleted for the jury.

[¶ 4] Smith was convicted of accessory to murder and conspiracy to commit murder following a jury trial at which all four co-defendants, each having entered guilty pleas, testified against him. At a subsequent trial,

he was found to be an habitual offender. He was sentenced to ten years on the accessory count and life imprisonment without parole on the conspiracy count, sentences to run concurrently.

[¶ 5] Smith appeals two issues relating to the videotaped interviews: 1) Whether the trial court abused its discretion in denying his motion to suppress his videotaped statement to police; and 2) Whether the trial court abused its discretion in allowing the jury to review the videotape after deliberations had begun.

## ANALYSIS & DECISION

[¶ 6] **1. Whether the trial court abused its discretion in denying Smith's motion to suppress his videotaped statement to police?**

[¶ 7] Smith claims his right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Article VI, Section 9 of the state constitution was violated because his videotaped statements were involuntary. Involuntary and coerced admissions are suppressed because of the inherent unreliability of a confession wrung from an unwilling suspect by threats, brutality, or other coercion. This Court reviews decisions of trial courts on motions to suppress under an abuse of discretion standard. *State v. Gesinger*, 1997 SD 6, ¶ 8, 559 N.W.2d 549. The State must prove beyond a reasonable doubt that defendant's statements were voluntary and a finding of voluntariness by the trial court is binding upon this Court unless it is found to be clearly erroneous. *Id.* at ¶ 9. On review, the evidence is considered in the light most favorable to the trial court's finding. *Id.* (citing *State v. DeNoyer*, 541 N.W.2d 725, 731 (S.D.1995)).

[¶ 8] When this Court examines a claim of involuntariness, it considers "the effect the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne." *State v. Thompson*, 1997 SD 15, ¶ 29, 560 N.W.2d

535, 541–42 (citing *State v. Darby*, 1996 SD 127, ¶ 28, 556 N.W.2d 311, 319; *State v. Dickey*, 459 N.W.2d 445, 447 (S.D.1990)). Factors considered in this examination include: 1) the defendant's age; 2) the defendant's lack of education or low intelligence; 3) the absence of any advice to the defendant of his constitutional rights; 4) the length of detention; 5) the repeated and prolonged nature of questioning; and 6) the use of physical punishment such as deprivation of food or sleep. *Id.* A defendant's prior experience with law enforcement officers and the courts is also a factor this Court considers. *Darby*, 1996 SD 127 at ¶ 30, 556 N.W.2d at 320. The question is not whether the interrogators' statements were the cause of the confession but whether those statements were so manipulative or coercive that they deprived Smith of his ability to make an unrestrained, autonomous decision to confess. *Gesinger*, 1997 SD 6 at ¶ 12, 559 N.W.2d at 551.

[¶ 9] The two interviews, which were the subject of Smith's motion to suppress and are the subject of this appeal, took place at the Sioux Falls police station on August 1, 1995. Both interviews were videotaped in their entirety. The record shows that Smith was 21 years old at the time and had completed eleventh grade. He had previous experience dealing with law enforcement and the judicial system. In August 1994, Smith pled guilty to felony grand theft. He had previously spent time in the penitentiary and, just ten days prior to these interviews, was incarcerated in the Minnehaha County jail. He had been questioned by these same detectives on previous occasions. On this occasion, Smith answered questions of two police detectives behind closed, but not locked, doors.[1] He was not deprived of food or water and was allowed to bring a beverage into the room and to smoke during questioning. The longer of the two interviews lasted less than one and one-half hours.

[¶ 10] The first interview on August 1, 1995 began at 1:15 p.m. and ended at 2:40 p.m. Smith was not given Miranda warnings and

---

1. Smith was questioned initially by Detectives Baker and Jensen and later, Baker and VanBuskirk. Lt. Folkerts entered the interview room briefly towards the end of the first interview. During the second interview, Smith was questioned by Detective Baker only.

was in fact told he was not under arrest and that he was free to leave at any time. This interview came about when he voluntarily accompanied his girlfriend to the station house as she was to be questioned regarding the Ross murder. Smith was at his girlfriend's home when the police arrived. In the driveway of his girlfriend's home, Detective VanBuskirk told Smith that the police had an opportunity to get everything straightened out that day and asked if he would come along. On this day, police interviewed several of the suspected participants. They had a fairly strong idea that Power was involved but there was a question regarding what, if anything, Smith and his girlfriend knew about the crime. Smith accepted a ride from police detectives and sat in the passenger seat. Both Smith and his girlfriend had been questioned before by police regarding the Ross murder and both knew the questioning on this date concerned the Ross murder.[2] Upon arrival at the station house, Smith walked past one of the co-defendants who had actually committed the murder and who had just been questioned. Following this interview, Smith agreed to remain at the police station for a possible re-interview.

[¶ 11] During and subsequent to this first interview of Smith on August 1, officers were in other interrogation rooms interviewing his girlfriend and three individuals who would later be his co-defendants. Each implicated Smith in the conspiracy to murder Ross. Before the start of Smith's second interview on August 1, 1995, which began at 4:50 p.m. and ended at 5:17 p.m., the police felt Smith had been transformed from one possibly having knowledge about the crime to a prime player in the case. They decided to place him in custody. Smith was Mirandized prior to the second interview and was not, in fact, free to leave. He waived his right to an attorney and agreed to speak with detectives.

[¶ 12] On appeal, Smith claims his statements during both interviews were involuntary and offers the following "evidence" to show his will was overborne and his confession coerced by police: he was under the influence of drugs during the interview; he was considered a possible participant in the murder; he was assured he would be "walking out" of the police station after questioning; he was provided with false representations regarding what others had said; and he was told he could not see his girlfriend until he told the truth and that after he did so, he could begin a new life with her. He claims that, most of all, his "precarious emotional state" regarding his girlfriend during the interviews warrants reversal of the trial court's finding of voluntariness.[3]

[¶ 13] Although Smith has an admitted history of methamphetamine abuse, the trial court found he did not appear to be under the influence of drugs when he gave the statements he later attempted to suppress.[4] Smith told detectives he had been sober for the past week and had not had any methamphetamine "in the last couple of days." At the suppression hearing, the officers who transported and interviewed Smith on August 1 testified he did not appear to have used or be under the influence of drugs that day. A review of both interviews indi-

---

**2.** On July 10, 1995, Smith was asked to come to the police station to speak with detectives about the Ross murder. This message was delivered to him through his girlfriend as police could not locate Smith. Smith voluntarily came to the station house for an interview. He was not in custody at that time and was not Mirandized. The record shows Smith was interrogated on July 21, 1995 regarding the Ross murder after having been arrested on outstanding warrants. This interview took place in the Minnehaha County jail and, as Smith was in custody at the time, he was given Miranda warnings. He waived his Miranda rights and agreed to speak with detectives. There is no claim by Smith that his statements to police on either of these dates were involuntary.

**3.** The videotape shows Smith confident with the detectives at the beginning of the first interview but as he spoke more with them, he became nervous and at one point, cried. Detective VanBuskirk testified at the suppression hearing that in his six years as a detective, Smith's demeanor was typical of others whose mood changed once they started confessing their guilt. He stated at no time did Smith strike him as belligerent or out of control.

**4.** In *State v. Tapio*, 459 N.W.2d 406, 411–12 (S.D.1990), this Court held a defendant's blood alcohol content of .164 did not presume a finding of involuntariness.

cates Smith understood what was being asked of him and was coherent and responsive. Smith's "evidence" in this regard consists of a statement Lt. Folkerts said to a codefendant while interviewing him.[5] This statement carries considerably less indicia of truth than Smith's own statements during his interview and his demeanor during the interview. It is the trial court's function to evaluate credibility and resolve conflicts in the evidence at a suppression hearing. *State v. Tilton*, 1997 SD 28, ¶ 21, 561 N.W.2d 660, 665–66. The trial court's finding of fact that Smith was not under the influence of drugs is not clearly erroneous and is supported by the record.

[¶ 14] Smith next claims his statements were involuntary because he was considered a possible participant in the Ross murder at the time of the first interview on August 1. He claims this Court's decision in *Darby* indicates this is a "significant consideration in determining voluntariness." This claim lacks merit. In *Darby*, police officers questioned an individual who had been named by his step-daughters as their sexual abuser prior to questioning. The police knew prior to questioning that he was a possible participant in the abuse. Darby was not given Miranda warnings when two detectives spoke with him first at his residence and later that day at the police station. In concluding the interrogation was noncustodial, we noted " '[t]he proper test in determining whether a person need be given the Miranda warning is not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave.' " *Darby*, 1996 SD 127 at ¶ 25, 556 N.W.2d at 319. Darby also raised a question of voluntariness; we affirmed the trial court's finding that his statements to police were voluntary without discussing his role as a possible participant in the sexual abuse. Smith has failed to show how this factor would support his claim of involuntariness.

[¶ 15] The remainder of Smith's claims under this issue involve alleged promises, threats, and false representations made to him by detectives which Smith asserts induced his statements against his will. The false representations alleged by Smith amount to the police implying they have more information about the crime than they actually have. This is a psychological tactic which does not upset a finding of voluntariness so long as the confession is " 'a product of the suspect's own balancing of competing considerations.' " *See Darby*, 1996 SD 127 at ¶ 31, 556 N.W.2d at 320; *Dickey*, 459 N.W.2d at 447; *State v. Jenner*, 451 N.W.2d 710, 719 (S.D.1990). Smith showed substantial capacity to resist police pressure; he was adamant that Power did not mention the name of the person he wanted killed, though several times the police attempted to get Smith to make that nexus. At no time were threats made for Smith's statements. Assurances were made to protect Smith and they involved taking Power into custody. However, no promises were made in exchange for Smith's statements. Furthermore, two of the statements were made by and attributed to Smith's girlfriend's mother and Smith's girlfriend and cannot be held to constitute coercion by police.[6] The evidence is to be considered in the light most favorable to the trial court's finding of voluntariness. Although Smith expressed concern about his girlfriend's welfare and his interrogators played on his emotions at times during the questioning, the evidence reveals no statements by the detectives that were so manipulative or coercive that he was deprived of his ability to "make an unrestrained, autonomous decision to confess."

[¶ 16] **2. Whether the trial court abused its discretion in allowing the jury to re-**

---

5. Lt. Folkerts did not interview Smith but stepped into the room briefly during Smith's first interview. Folkerts' statement, made to Power regarding his own drug use, was: "And you're hanging with all these, now let me tell you something Mike Smith today is flying high, all these guys are buzzed up, and you're telling me you don't do that."

6. Police told Smith, upon his having asked, that his girlfriend's mother said he had better tell police the truth or he would not see her daughter again. She later testified at trial that she had in fact made this statement to police in the driveway of her home on August 1.

**view the videotape after deliberations had begun?**

[¶ 17] The trial court enjoys broad discretion to allow testimony or properly admitted exhibits to be examined during deliberations. *State v. Luna*, 264 N.W.2d 485 (S.D.1978). The record shows the jury took all of the exhibits, including the videotapes, into deliberations. There was no television or VCR in the jury room. The jury requested to view the videotapes a second time, the first being during the trial. The jury's note indicated that the tapes were sent in as evidence but did the jury "little good sitting on the table." Initially, the trial court denied the request, but upon a second request by the jury, permitted the viewing over objections by both Smith and the State. The court reminded both attorneys that the jury was making the demand and that the court did nothing to bring these exhibits to the jury's attention. On re-view, the trial court brought the jury back into the courtroom and instructed that it must not engage in any deliberations during the viewing. Smith's videotaped statement to the police was played again, with all references to prior convictions, probation, probation officers, and the penitentiary deleted.

[¶ 18] SDCL 23A-25-7 permits a jury to "take all exhibits and all papers which have been received as evidence in the case" into the jury room during deliberations. The videotapes were marked, received and treated at all times by the court and the parties as trial exhibits. Smith claims the "re-view" prejudiced him by emphasizing this piece of evidence. The burden to prove undue prejudice rests with the defendant. *State v. Eagle Star*, 1996 SD 143, ¶ 14, 558 N.W.2d 70, 73. This Court has not previously addressed the question raised by Smith in his appeal. *See State v. Miller*, 248 N.W.2d 56, 60 (S.D.1976) (having determined to admit colored slides of deceased child, trial court did not err in permitting jurors to have a projector in the jury room); *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101, 112 (1965), *cert. denied*, 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76, *overruled on other grounds, State v. Waff*, 373 N.W.2d 18 (S.D.1985) (no abuse of trial court's discretion in permitting viewer into jury room when colored slides were an exhibit and jury had seen slides projected on screen in courtroom during trial).

[¶ 19] The majority rule among jurisdictions having addressed a similar question permits a jury to replay videotaped confessions during deliberations. In *State v. Robinson*, 79 Hawai'i 468, 903 P.2d 1289, 1293–95 (1995), the Supreme Court of Hawaii held the trial court did not err in permitting the jury access to videotapes of the defendant's confession on an unlimited basis where the videotapes had been admitted into evidence. The court recognized a qualitative difference between the "type of physical evidence of a defendant's confession" and a witness' out-of-court statement or deposition which may not be taken into the jury room during deliberations though it is admitted into evidence.[7] "Whereas, the testimony of a witness is given under oath and is subject to cross-examination, a defendant's taped confession is a *'tangible exhibit* which is *non-testimonial* in character.' Once properly admitted, a 'tangible exhibit' may be taken into the jury room." *Robinson*, 903 P.2d at 1294 (emphasis original).

[¶ 20] In *People v. Ferrero*, 874 P.2d 468 (Colo.App.1993), *cert. denied*, 874 P.2d 468 (Colo 1994), the Colorado Court of Appeals ruled "[j]urors may not have unsupervised access during deliberations to a videotape of a *witness'* out-of-court statement that was admitted into evidence in a criminal case," but noted it had "previously held, however, that the same rule does not apply to evidence of a voluntary confession by the *defendant"*. *Id.* at 472–73 (emphasis original). The *Ferrero* Court continued:

> A confession which has been shown by the state to be free from coercive conditions is among the strongest kind of physical evidence the prosecution may produce. Thus, during its deliberations, the jury may have unsupervised access to the transcript of a confession.

---

7. This Court has made a similar ruling regarding deposition evidence. See *Luna*, 264 N.W.2d at 490 (applying to criminal cases the rule of civil procedure that "depositions are specifically excepted from evidence which the jury may take to the jury room during deliberation.").

We perceive no reason to distinguish between the *transcript* of a defendant's confession and a *videotape* of that same confession. A videotape is merely a modern substitute for a written statement; it accomplishes the same purpose but more expeditiously and more correctly.

*Id.* (emphasis original).

[¶ 21] The Supreme Court of Ohio also so held in *State v. Loza*, 71 Ohio St.3d 61, 641 N.E.2d 1082 (1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1983, 131 L.Ed.2d 871 (1995), noting that it follows the majority rule permitting replay of a videotaped confession during jury deliberations. "There is no prejudicial error in the jury's viewing a second time an exhibit properly admitted into evidence." *Id.* at 1103. The court noted the propriety of sending a defendant's confession into the jury room rests with the sound discretion of the trial court and found no abuse of that discretion in this case.

[¶ 22] As noted above, the majority rule permits a jury's reviewing a defendant's videotaped or audiotaped confession during deliberations where that recording is a properly admitted trial exhibit. *See Hampton v. State*, 569 P.2d 138, 146 (Alaska 1977); *People v. Walker*, 150 Cal.App.2d 594, 310 P.2d 110, 115–16 (1957); *People v. Caldwell*, 39 Ill.2d 346, 236 N.E.2d 706, 712–13 (1968); *Ingram v. State*, 547 N.E.2d 823, 828–29 (Ind.1989); *State v. Triplett*, 248 Iowa 339, 79 N.W.2d 391, 396 (1956); *State v. Poulos*, 230 Kan. 512, 639 P.2d 477, 479 (1982); *State v. Barbo*, 339 N.W.2d 905, 906 (Minn.1983); *State v. Evans*, 639 S.W.2d 792, 795 (Mo. 1982); *State v. Fried*, 92 N.M. 202, 585 P.2d 647, 648–49 (N.M.Ct.App.1978); *State v. Halvorson*, 346 N.W.2d 704, 712 (N.D.1984); *Lambert v. Oklahoma*, 888 P.2d 494, 505–06 (Okla.Crim.App.1994); *State v. Reyes*, 209 Or. 595, 308 P.2d 182, 196 (1957); *Reed v. State*, 794 S.W.2d 806, 809 (Tex.App. 1990), *cert. denied sub nom, Amerson v. Texas*, 500 U.S. 918, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); *State v. Dietz*, 182 W.Va. 544, 390 S.E.2d 15, 28–29 (W.Va.1990). *See also* Annotation, *Permitting Documents or Tape Recordings Containing Confessions of Guilt or Incriminating Admissions to be Taken into Jury Room in Criminal Case*, 37 A.L.R.3d 238 (1971); 2 McCormick on Evidence § 217, at 29 (4th ed. 1992) (noting the theory underlying the majority rule is that the confession's centrality to the case warrants whatever emphasis may result).

[¶ 23] Where the practice has been disapproved, it has been based on statutory prohibition (in the case of a written confession, *see Comm. v. Terry*, 501 Pa. 626, 462 A.2d 676 (1983)) or a finding that the trial court abused its discretion in granting the jury's request. *See Comm. v. Foster*, 425 Pa.Super. 61, 624 A.2d 144 (1993) (finding abuse of discretion, court noted statute does not prohibit videotaped confession in jury room but reason underlying statute prohibiting written confession in jury room is considered). In *Franklin v. State*, 74 Wis.2d 717, 247 N.W.2d 721 (1976), the Wisconsin Supreme Court found abuse of discretion in the trial court's decision to send the defendant's taped confession and a tape recorder into the jury room during deliberations. The court cited the risk of the jury's accidentally breaking or erasing the tape and found a "danger of overemphasis of the confession relative to testimony given from the witness stand." *Id.* at 725. The court stated that as a matter of "proper practice and procedure," trial courts should retain control of jury exposure to all confessions, both written and recorded and offered that the jury should be returned to the courtroom to hear the recorded confession replayed or written confession reread. *Id.*[8]

[¶ 24] Smith has failed to show that the trial court abused its discretion.

[¶ 25] We affirm on all issues.

[¶ 26] MILLER, C.J., and SABERS, AMUNDSON, KONENKAMP and GILBERTSON, JJ., participating.

---

**8.** In *United States v. Hofer*, 995 F.2d 746 (7thCir.1993), the Seventh Circuit Court of Appeals refused to extend Franklin, noting it was the jury's duty to evaluate the defendant's tone, inflections and demeanor on an audiotape containing incriminating statements where the defendant claimed pretense, and "[i]n order to perform this duty conscientiously, it may have been necessary for the jury to play the tapes repeatedly as its deliberations progressed." *Id.* at 749.