2000 SD 12

**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Patty HERTING, Defendant and Appellee.**

**No. 20887.**

Supreme Court of South Dakota.

Considered on Briefs Nov. 29, 1999.

Decided Jan. 26, 2000.

Mark Barnett, Attorney General, Paul Cremer, Assistant Attorney General, Pierre, for plaintiff and appellant.

Michael Stonefield, Rapid City, for defendant and appellee.

GILBERTSON, Justice.

[¶ 1.] State appeals an order suppressing certain statements made by the defendant, Patty Herting (Herting) prior to her arrest. We reverse.

## FACTS AND PROCEDURE

[¶ 2.] On November 7, 1998, at approximately 2:30 a.m., Pennington County Deputy Sheriff Ron Nordell (Nordell) went to the residence of Steve and Patty Herting after he received a dispatch regarding a possible domestic violence situation. Upon arriving at the Herting home, Nordell and Herting recognized each other because they had both been involved in the Cub Scouts. As he approached the residence, Herting volunteered words to the effect "she would get her shoes on, as she knew Nordell would be taking her with him."

[¶ 3.] After this brief initial contact, Nordell went into the residence and spoke with Herting's husband, Steve. Steve told Nordell, Herting had hit and choked him. Nordell observed that Steve had physical injuries, including swelling around the

right eye and some red marks around the neck. Nordell next spoke with D.L., Herting's seven-year-old son. D.L.'s statement to Nordell was consistent with Steve's statement regarding the conduct of Herting.

[¶ 4.] Nordell proceeded through an open door to the back bedroom, where Herting was located. Nordell asked Herting one question: "What happened tonight?" No *Miranda* warnings were given. Herting responded that Steve had accused her of having an affair with a male friend. Herting readily admitted this accusation had upset her so she hit and choked Steve. Nordell then arrested Herting for simple assault. While she was being arrested, Herting stated, "No, don't say anything more." Nordell complied with her request and this ended his attempt to ascertain from all those present the facts surrounding the evening's events.

[¶ 5.] A preliminary hearing was held on January 11, 1999. The magistrate court found probable cause to bind the matter over for trial. A motion hearing was held before the court on January 26, 1999, at which time the court granted Herting's motion to suppress the statements she made to Nordell inside her residence on the night of her arrest. The volunteered statement previously made outside the home was not suppressed. State appeals, raising the following issue for our consideration:

**Whether Herting was in custody for *Miranda* purposes.**

**STANDARD OF REVIEW**

[¶ 6.] As the facts are uncontested, the State is challenging the trial court's conclusions of law regarding whether *Miranda* warnings were required in this case. Whether a suspect is in custody, and therefore entitled to *Miranda* warnings, presents a mixed question of law and fact qualifying for independent review. *State v. Gesinger*, 1997 SD 6, ¶ 7, 559 N.W.2d 549, 550 (citing *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 460, 133 L.Ed.2d 383, 388 (1995)).

**ANALYSIS AND DECISION**

[¶ 7.] **Whether Herting was in custody for *Miranda* purposes.**

[¶ 8.] State argues the trial court's conclusions of law regarding the necessity of *Miranda* warnings in this case are based on an error of law. We agree. There is no dispute Nordell did not read Herting her *Miranda* rights prior to asking her the single question at her residence. *Miranda* warnings must be given whenever a defendant is interrogated while in police custody. *State v. Thompson*, 1997 SD 15, ¶ 23, 560 N.W.2d 535, 540 (other citations omitted). We have recently stated:

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*Id.* (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977)). The *Mathiason* standard was reaffirmed by the United States Supreme Court in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). This Court recently cited the *Mathiason* standard with approval in *State v. Darby*, 1996 SD 127, ¶ 25, 556 N.W.2d 311, 318–19. *See also State v. Jenner*, 451 N.W.2d 710, 719 (S.D.1990); *State v. Perkins*, 444 N.W.2d 34, 39 (S.D.1989); *State v. McQuillen*, 345 N.W.2d 867, 869 (S.D. 1984); *State v. Branch*, 298 N.W.2d 173, 175 (S.D.1980).

■ [¶ 9.] The test in determining whether *Miranda* warnings are required "is not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave." *Thompson,* 1997 SD 15, ¶ 24, 560 N.W.2d at 540 (quoting *Darby,* 1996 SD 127, ¶ 25, 556 N.W.2d at 319 (other citations omitted)). The United States Supreme Court recently expanded on the *Mathiason* standard, holding "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* ¶ 25, 560 N.W.2d 535. Further, this Court has stated:

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Id.* (quoting *Stansbury v. California,* 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293, 300 (1994)).

■ [¶ 10.] Our review of the circumstances surrounding Nordell's asking a single question of Herting indicates she was not so deprived of her freedom as to be "in custody" for *Miranda* purposes. Nordell posed only one question to Herting: "What happened tonight?" We believe this broad open-ended question indicates Nordell was simply gathering facts as to what happened that night. Nordell testified at the motion hearing he was "investigating a crime scene" and wanted to "talk to all parties involved...." Nordell also testified when he went into the bedroom to visit with Herting, he was not yet finished with his investigation. "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding [in *Miranda* ]." *Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966). This proposition was expressly adopted by this Court in *State v. Bartunek,* 323 N.W.2d 121, 124 (S.D.1982). There, this Court upheld the trial court's denial of the defendant's motion to suppress statements given to a law enforcement officer because "the officer was conducting general on-the-scene questioning." *Id.* at 125. Many other courts have adopted this proposition as well. *See generally* J.F. Ghent, Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring That Suspect Be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* 31 ALR3d Supp. 565, § 3 (1997). "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Gesinger,* 1997 SD 6, ¶ 17, 559 N.W.2d at 552. General on-the-scene questioning and fact gathering is absolutely essential for law enforcement officers to perform their jobs well and to investigate possible crimes. *See People v. Haugland,* 115 Cal.App.3d 248, 171 Cal.Rptr. 237, 241 (1981):

When circumstances demand immediate investigation by the police, the most useful, the most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.

To do otherwise in domestic abuse cases such as this invites the risk of arresting the wrong person.

[¶ 11.] Herting claims the purpose of Nordell's questioning was to obtain a confession. We disagree. Nordell testified at the motion hearing that Steve's injuries could have been inflicted by Herting while she was defending herself. While no marks were visible on Herting, for all Nordell knew, they could be internal, hidden by clothing or she could have defended herself without receiving any injuries.

[¶ 12.] Herting argues her initial statement to the effect "she would get her shoes on, as she knew Nordell would be taking her with him," reflects a state of mind that knew she was going to be arrested. However, we believe this statement is ambiguous. Herting's statement could just as easily be construed to mean she was going to leave with Nordell because she needed protection from her husband. Nordell testified at the motion hearing that when questioned about what happened, Steve told him *"they got into a fight* and that she hit him and choked him." Because SDCL 23A–3–2.1(2) mandates an arrest of the instigator of domestic violence, Nordell had an obligation to get *both* sides of the story before making that mandatory arrest. Nordell testified after he spoke with Steve and D.L., he "was still kind of unsure of what was going on and, you know, I like to talk to all parties involved before I make that [arrest] determination." Steve had already given Nordell his side of the story; Nordell was simply giving Herting an opportunity to explain her version of the facts. If Herting had been the victim, rather than the perpetrator of domestic violence, for Nordell to take Steve's version of the facts without letting Herting verbally explain herself and subsequently erroneously arrest Herting as the perpetrator, would have victimized her a second time—this time at the hands of law enforcement. Nordell's lone question of "what happened tonight" is hardly pointed questioning aimed at getting Herting to confirm Steve's story so she could be arrested.

[¶ 13.] Herting did not testify at the hearing. Nevertheless, the trial court, in determining Herting's perception was that she was not free to leave her home, noted "it is clear that when [Nordell] first arrived there, [Herting] knew she was going to be going with the deputy." The trial court based this determination on Herting's statement to Nordell when he arrived at her home that she was getting her shoes as she was going with him. Herting's subjective thoughts are not a proper basis for the determination of whether she was in custody. *Thompson,* 1997 SD 15, ¶ 25, 560 N.W.2d at 540. Again, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Gesinger,* 1997 SD 6, ¶ 18, 559 N.W.2d at 552. We believe a reasonable person in Herting's situation would have understood Nordell was simply trying to get her explanation of events before determining if an arrest should be made and if so who should be arrested. Moreover, Herting was no stranger to the law. She had two prior arrests on her record; one for burglary and the other for driving under the influence.

[¶ 14.] There is no indication Herting felt intimidated when Nordell arrived at her residence. The record contains no proof Nordell used "strong arm tactics or deceptive stratagems." *See United States v. Griffin,* 922 F.2d 1343, 1351 (8th Cir.1990) (noting that a strong presumption of im-

propriety attaches to any circumstances where the court detects the use of coercive or deceptive interrogation techniques to obtain confessions). Herting apparently recognized Nordell from Cub Scouts. Herting stated to Nordell when he first arrived at the residence, "[i]t's the Cub Scout guy." Moreover, Nordell's conversation with Herting took place at her own home. " '[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings', such as the suspect's home." *United States v. Erving L.,* 147 F.3d 1240, 1247 (10th Cir.1998) (quoting *United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir.1994)). The record indicates Nordell was well mannered and courteous and that he did not adopt a threatening posture or make a show of physical force.

[¶ 15.] We find Herting was not subjected to a custodial interrogation under the circumstances and facts presented. We reverse the order suppressing Herting's statement to Nordell.

[¶ 16.] MILLER, Chief Justice, and SABERS, AMUNDSON and KONENKAMP, Justices, concur.