2000 SD 149

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Pedro MORATO, Defendant and Appellant.**

No. 21363.

Supreme Court of South Dakota.

Considered on Briefs Oct. 23, 2000.

Decided Nov. 29, 2000.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, SD, Attorneys for plaintiff and appellee.

Donald M. McCarty of McCann and Ribstein, Brookings, SD, Attorney for defendant and appellant.

KONENKAMP, Justice

[¶ 1.] The defendant, Pedro Morato, appeals his convictions on three counts of aggravated assault, contending that the circuit court erred in admitting his incriminating statements and in not suppressing a jack handle taken from his vehicle without a search warrant. We affirm these rulings, but reverse and remand for resentencing, as only one offense was committed, not three.

### A.

[¶ 2.] At 4:00 a.m. on April 17, 1999, Officer Bradley Deaver of the Brookings Police Department was dispatched to the local emergency room. Taylor Roberts was being treated there for what appeared to be a severe beating. Roberts had cuts and abrasions on his face. His left eye was swollen shut. He had a deep wound on his forehead. According to the medical personnel, Roberts had a "blow out fracture of the left orbit with [a] buckle fracture of the left lateral sinus wall." Deaver thought Roberts' injuries had been caused by a blunt object.

[¶ 3.] Deaver attempted an interview, but Roberts could not remember much of what occurred. He told Deaver that he had been walking through Normandy Village, a Brookings trailer court, on his way to a friend's home when a white Chevy S-10 pickup pulled up alongside him. He recognized Keith Whitehead and recalled that Whitehead stepped from the vehicle and confronted him. After that, all he could remember was being on the ground, having been beaten.

[¶ 4.] Deaver returned to the police department and discussed the case with Officer Even. Even recalled that earlier he had seen Keith Whitehead speaking with an individual in a white "low-rider" pickup with Florida license plates. Another officer had run a license plate check on the

white pickup. Deaver obtained the license plate number from the police dispatch log and ran another check on the vehicle: the white pickup truck was registered to Pedro Morato. Officer Even told Deaver that Keith Whitehead was living at 920 Southland Lane. Deaver had a patrol officer drive by the residence to see whether the white pickup with Florida license plates was parked there. It was.

[¶ 5.] Deaver and another officer drove to the apartment complex and looked through the truck window. They spotted a jack handle lying on the floor of the pickup. The two officers proceeded to Whitehead's apartment. A female answered the door. She told the officers that Keith was home and invited them in. As he walked into the apartment, Deaver saw a man sleeping in an easy chair. He asked the man who owned the pickup. The man, later identified as Morato, responded that it was his vehicle. Keith Whitehead came out of the bedroom, and the officers asked both men to accompany them outside. Morato was escorted to Deaver's patrol car while Whitehead was taken to another patrol car.

[¶ 6.] Once Deaver and Morato were seated in the car, Deaver started a tape recorder. In the initial moments of the recording the following exchange took place:

Deaver: Hey listen, man, I also want you to understand you don't have to talk to me if you don't want to, alright?

Morato: Yeah, I know, I know.

Deaver: You're free to leave, um you're not under arrest.

Morato: Well, I just can't even talk right now cause you know I'm probably still, you know, messed up and stuff and that's the way it is.

In addition to commenting on his intoxicated state, Morato said that he did not remember anything of an altercation the night before. Morato did not say that he wished to leave the car or that he refused to talk; instead, his comments indicated only an inability to talk at that time because he was "drunk or halfway drunk."

[¶ 7.] Deaver noticed an odor of alcoholic beverage on Morato and saw that his eyes were slightly bloodshot. Morato had no difficulty walking from the apartment to the car, however. Deaver later described Morato's speech as "slightly slurred," but explained that he did not know whether this was attributable to Morato's alcohol consumption or his unfamiliar accent. Deaver exited the vehicle for a few minutes leaving Morato alone in the car.

[¶ 8.] When Deaver returned, the following conversation took place:

Deaver: Pedro.

Morato: Yeah.

Deaver: Here's what's going to happen, Pedro. We're going to tow your truck. Okay? Cause we believe that you and Keith and John were involved in an assault last night, and we believe, uh, the weapon that was used to assault the subject is in that _____ vehicle right now. So, we're going to have to tow it, secure it, so we can obtain a search warrant and go through the vehicle. Okay? You understand?

Morato: Yeah.

Deaver: You know why we're doing this, right?

Morato: Yeah, I know.

Deaver: You know what happened last night?

Morato: Yeah, I know what happened.

Deaver: Okay. You wanna tell me about it?

At this point Morato explained that he used "the bar" to hit the victim because the victim took a swing at him: "I had to defend myself." After this admission Morato was told he was no longer free to leave. Deaver read Morato the Miranda warnings and Morato invoked his right to counsel. Deaver told Morato that he needed to

remove the jack handle from the pickup and requested Morato's permission to obtain it. Morato responded that he had the keys in his pocket and indicated which key would unlock the vehicle.

[¶ 9.] Morato was charged with three counts of aggravated assault. He moved to suppress, and after a hearing the circuit court denied the motion as it pertained to the pre-arrest statements and the admission of the jack handle. However, the court did suppress a written statement executed by Morato after his arrest.[1] The case was tried to the court on stipulated evidence. Morato was found guilty on all three counts of aggravated assault. He appeals, presenting six issues for review.[2] These issues challenge only two rulings. Therefore, we will address Morato's arguments in light of these two decisions. First, did the court err in admitting Morato's pre-arrest statements? Second, should the court have suppressed the jack handle removed from Morato's truck without a search warrant?

**B.**

■ [¶ 10.] Morato asserts that his incriminating statements made while sitting in Deaver's patrol car were involuntary and given without Miranda warnings as required for custodial interrogations. We recently clarified our standard of review. *See State v. Stanga,* 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488; *State v. Hirning,* 1999 SD 53, ¶ 9, 592 N.W.2d 600, 603. Fact findings are reviewed for clear error, but ultimately, in reviewing decisions on motions to suppress for asserted constitutional violations our standard of review is *de*

*novo. Stanga,* 2000 SD 129, ¶ 8, 617 N.W.2d at 488 (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996)).

■ [¶ 11.] There are two constitutional safeguards against involuntary confessions. *Dickerson v. United States,* 530 U.S. 428, ——, 120 S.Ct. 2326, 2330, 147 L.Ed.2d 405, 413 (2000). The Due Process Clause of the Fourteenth Amendment prohibits involuntary confessions, and the Fifth Amendment right against self-incrimination requires Miranda warnings for custodial interrogations. *Id.,* 530 U.S. at ——, 120 S.Ct. at 2330, 147 L.Ed.2d at 413. In addressing a Due Process voluntariness challenge, the circumstances surrounding an interrogation are factual questions meriting deferential review. *Stanga,* 2000 SD 129, ¶ 8, 617 N.W.2d at 488 (citations omitted). The crucial determination of voluntariness is, on the other hand, "a legal question, requiring independent judicial review." *Id.* (citing *Miller v. Fenton,* 474 U.S. 104, 115–16, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405, 414–15 (1985)).

■ [¶ 12.] The State bears the burden of proving beyond a reasonable doubt the voluntariness of a defendant's statements. *State v. Smith,* 1998 SD 6, ¶ 7, 573 N.W.2d 515, 517 (citations omitted). In deciding whether the State met this burden, we review "the effect [that] the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne ." *Smith,* 1998 SD 6, ¶ 8, 573 N.W.2d at 517 (string citation and internal quotes omitted); *State v. Gesinger,* 1997 SD 6, ¶ 12, 559 N.W.2d 549,

---

1. The State does not challenge the circuit court's decision to suppress the written statement.

2. Morato states his six issues as follows: (1) "Whether the statements made by Morato both before and after Miranda warnings were voluntary." (2) "Whether Morato was subject to custodial interrogation prior to formal arrest requiring Officer Deaver to administer Miranda warnings." (3) "Whether the warrantless entry into Morato's vehicle was con-

stitutionally permissible based on Morato's consent." (4) "Whether the warrantless entry and search of the vehicle was constitutionally permissible pursuant to the automobile exception to the warrant requirement." (5) "Whether the warrantless entry of the vehicle to obtain the jack handle was constitutionally permissible pursuant to the plain view doctrine." (6) "Whether the warrantless entry and search of the vehicle was constitutionally permissible based on inevitable discovery."

550 (citations omitted). A defendant's will is overborne, making a statement involuntary, when interrogation tactics and statements are so manipulative or coercive as to deprive a defendant of the "ability to make an unconstrained, autonomous decision to confess." *Gesinger*, 1997 SD 6, ¶ 12, 559 N.W.2d at 551 (citing *State v. Kaiser*, 504 N.W.2d 96, 101 (S.D.1993); *State v. Dickey*, 459 N.W.2d 445, 448 (S.D.1990)) (internal quotations omitted).

[¶ 13.] To discern if a defendant's will was overborne or if police tactics deprived a defendant of the ability to choose, we examine the duration of detention; the defendant's age, educational background, and prior experience with law enforcement; whether the defendant received advice on constitutional rights; and whether the interrogators used repeated or prolonged questioning, or physical deprivation of such things as food or sleep. *State v. Darby*, 1996 SD 127, ¶ 28, 556 N.W.2d 311, 319. The presence or absence of any one of these factors alone is not dispositive as we review voluntariness in the totality, considering all the circumstances surrounding the defendant's encounter with law enforcement. *See Smith*, 1998 SD 6, ¶ 8, 573 N.W.2d at 517 (citations omitted).

[¶ 14.] Deaver arrived at the apartment where Morato was staying sometime after 6:00 a.m. on April 17, 1999. The interview was given outside the apartment in Deaver's patrol car. All but the initial seconds of the interview were recorded on audiotape. Born on April 27, 1978, Morato was just short of his twenty-first birthday at the time. He did not complete high school; he dropped out after passing the ninth grade on his second try. Nonetheless, Morato had been gainfully employed. He was young, but really no younger than the defendant in *Smith*, who was twenty-one and had completed the eleventh grade. *Smith*, 1998 SD 6, ¶ 9, 573 N.W.2d at 517. We noted in *Smith* that these factors must be juxtaposed against the defendant's previous experience with law enforcement. *Id.* Morato was familiar with police interrogation procedures. He had previously been questioned regarding the discharge of a firearm in 1997. Furthermore, he was ticketed for a DWI in April of 1999 a few weeks before this encounter in Brookings.

[¶ 15.] Deaver's interview did not involve prolonged questioning. In fact, less than fifteen minutes after the interview began, Morato admitted that he had struck the victim with the jack handle. English is Morato's second language, but it is clear from the evidence and the tape of Morato's interview that he had no difficulty understanding Deaver's questions. Morato emphasizes that he was intoxicated and had only an hour and a half of sleep at most before the officers arrived. Yet the court heard contradictory evidence on Morato's state of sobriety and his mental alertness, and it is the court's function to resolve conflicts in the evidence. *Smith*, 1998 SD 6, ¶ 13, 573 N.W.2d at 519 (citations omitted). Even Morato admitted that he did not stagger and had no problems getting from the apartment to the patrol car.

[¶ 16.] The interview was straightforward, with no trickery or deceit. *See Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d at 320 (explaining that deception by law enforcement may also be a consideration). In an attempt to show that his will was overborne, Morato points to Deaver's statement that his pickup would be secured so a search warrant could be obtained. No rule of law prohibits officers from informing suspects what will be done with their property. And, if anything, the officer's statement here only served to better inform Morato of what procedures would be implemented. After reviewing the evidence in its totality we uphold the circuit court's conclusion that Morato's statement was voluntary.

## C.

[¶ 17.] Morato contends that his statements should have been suppressed

because he was subjected to custodial interrogation without the benefit of Miranda warnings. Miranda warnings are necessary whenever a defendant is interrogated in police custody. *State v. Thompson,* 1997 SD 15, ¶ 23, 560 N.W.2d 535, 540 (citations omitted). The circuit court found that the pre-arrest interview in Deaver's patrol car was noncustodial. We independently review whether a suspect was in custody, entitled to Miranda warnings. *Gesinger,* 1997 SD 6, ¶ 7, 559 N.W.2d at 550 (citations and internal quotes omitted).

[¶ 18.] To ascertain whether an individual was in custody we do not probe the subjective beliefs of the defendant or the interviewing officer. *Thompson,* 1997 SD 15, ¶ 25, 560 N.W.2d at 540 (citations omitted). Our inquiry is an objective one, questioning how a reasonable person in the suspect's position would view the situation. *State v. Herting,* 2000 SD 12, ¶ 13, 604 N.W.2d 863, 866 (citing *Gesinger,* 1997 SD 6, ¶ 18, 559 N.W.2d at 552. We examine all of the circumstances surrounding the interview and "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Gesinger,* 1997 SD 6, ¶ 17, 559 N.W.2d at 551–52 (citing *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1994)) (further citations and internal quotes omitted). The test for custodial interrogation is not whether investigators have "focused on" a particular suspect, but whether the interrogators deprived the suspect of the "freedom to leave." *See Darby,* 1996 SD 127, ¶ 25, 556 N.W.2d at 319 (internal quotations and citations omitted). Of course, almost any police interview of a crime suspect will have "coercive aspects." *Id.* The Miranda warnings, however, will not be required simply because an interview occurs in a police station or a patrol car. *See id.* at ¶¶ 25, 26, 556 N.W.2d at 319 (internal quotations and citations omitted).

[¶ 19.] Viewed in their totality, the circumstances surrounding Morato's interrogation were not custodial. After telling Deaver that he owned the pickup, Morato accompanied Deaver outside at Deaver's request. When Morato got into the patrol car, Deaver activated a tape recorder. The recording reveals that Morato was told "you're free to leave" and "you're not under arrest." Likewise, Deaver informed Morato that "you don't have to talk to me if you don't want to," and Morato replied, "Yeah, I know, I know." Thus, Morato understood that he was not under arrest and that Deaver was not forcing him to remain in the patrol car. The taped conversation confirms that Deaver's tone was conversational. *See Thompson,* 1997 SD 15, ¶ 28, 560 N.W.2d at 541. Morato argues that he "indicated that he did not want to speak with the officer." A close review of the taped interview, however, does not disclose an unwillingness to speak to the officer. Instead, Morato simply said he did not know if he was sober enough to talk. At no time before his formal arrest did Morato decline to answer questions or suggest that he wished to leave the car.

[¶ 20.] Morato emphasizes that Deaver exited the vehicle for approximately three minutes and upon his return "the nature of the interrogation changed." Deaver explained to Morato what was going to happen: "We are going to tow your truck O.K. Because we believe that you and Keith and John were involved in an assault last night." Even an unequivocal "statement from an officer that the [defendant] is a prime suspect is not, in itself dispositive of the custody issue[;] . . . [t]he weight and pertinence of any [such communication] . . . will depend on the facts and circumstances of the particular case." *Herting,* 2000 SD 12, ¶ 9, 604 N.W.2d at 865 (quoting *Stansbury v. California,* 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293, 300 (1994)). Certainly, at this point the investigation was moving closer to an arrest. But Deaver had yet to communicate an intention to arrest Morato or either of his two companions. Although this is a

close question, we conclude the circuit court correctly ruled that the objective conditions surrounding the interview remained noncustodial.

## D.

[¶ 21.] Morato next asserts that the jack handle found in his vehicle was inadmissible because it was taken in violation of his right against unreasonable search and seizure. The circuit court ruled that Morato consented to the search of his vehicle. Morato challenges this finding, insisting that his consent was requested after he refused to waive his Miranda rights; thus, the jack handle should have been suppressed. Morato also claims that the consent, itself, was involuntary.

[¶ 22.] The existence of a valid consent is a question of fact; therefore, we give deference to the circuit court's findings and apply a clearly erroneous standard of review. *See State v. Benallie,* 1997 SD 118, ¶ 10, 570 N.W.2d 236, 238 (citing *State v. Dreps,* 1996 SD 142, ¶ 8, 558 N.W.2d 339, 341)(internal quotes omitted). On the other hand, deciding whether law enforcement officers had a lawful basis to conduct a warrantless search presents a question of law. *Hirning,* 1999 SD 53, ¶ 8, 592 N.W.2d at 603 (citations omitted).

[¶ 23.] It is undisputed that Morato's consent to search his truck was obtained after he requested an attorney. Once an accused requests the assistance of counsel the current interrogation must cease and the suspect cannot be approached for further questioning until counsel is made available. *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158, 167 (1991) (citations omitted). Similarly, a defendant may not

be subjected to the "functional equivalent" of interrogation, namely words or actions on the part of the police that are likely to elicit an "incriminating response." *State v. Cody,* 323 N.W.2d 863, 866 (S.D.1982) (citing *Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 307–08 (1980)). An officer's request that a suspect consent to a search, however, is not interrogation or its functional equivalent. *See United States v. Shlater,* 85 F.3d 1251, 1256 (7th Cir.1996) (The same view is "taken by every court of appeals to have addressed the issue.") (citations and internal quotations omitted).

[¶ 24.] Morato's consent to search does not constitute an incriminating statement. *See Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.1985) (citations omitted). *See also State v. Houser,* 241 Neb. 525, 490 N.W.2d 168, 176 (1992). Nor does the fact that incriminating evidence was discovered in the subsequent search change the analysis. In reaching this conclusion, we are not ignoring Morato's invocation of his right to counsel. We are simply declaring that any asserted violation of a Fifth Amendment right is only one factor to consider when deciding "the voluntariness of the consent in view of the totality of the circumstances." *See Cody,* 755 F.2d at 1330 (citations omitted).[3] Consequently, we are left to ask whether Morato's consent was voluntary in light of all the circumstances. *See State v. Dreps,* 1996 SD 142, ¶ 9, 558 N.W.2d 339, 341 (citations omitted).

[¶ 25.] The State has the burden of proving by clear and convincing evidence that a consent was voluntary. *See Benallie,* 1997 SD 118, ¶ 10, 570

---

**3.** Morato cites opposing authority which holds "[i]n effect the request to search is a request that the defendant be a witness against himself which he is privileged to refuse under the Fifth Amendment." *State v. Williams,* 248 Or. 85, 432 P.2d 679, 683 (1967). *See also Pirtle v. Indiana,* 263 Ind. 16, 323 N.E.2d 634 (1975). *Pirtle,* however, relies on the fact that a consent to search is

"critical stage" in the proceedings against the defendant. 323 N.E.2d at 638–39. The persuasive force of such reasoning has been brought into question because of later case law noting that the Sixth Amendment right to counsel does not attach until after adversary judicial proceedings have been instituted. Wayne R. LaFavre, Search and Seizure, § 8.2(k) at 693 (3rd ed. 1995).

N.W.2d at 238 (citations omitted). To be voluntary, consent must not be the "product of duress or coercion." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854, 863 (1973). *See also State v. Hanson*, 1999 SD 9, ¶ 25, 588 N.W.2d 885, 891. The State cannot meet its burden if consent was a result of a mere submission to authority. *State v. Nemeti*, 472 N.W.2d 477, 480 (S.D. 1991) (citations omitted).

[¶ 26.] A thorough review of all the circumstances surrounding Morato's arrest establishes that his consent was indeed voluntary. In its findings of fact, the circuit court specifically found that in response to Deaver's request to enter the vehicle, Morato not only consented, but also told Deaver that he had the key in his pocket. Morato then indicated which key would open the vehicle. These facts when viewed in conjunction with the circumstances noted above do not indicate "a mere submission to authority." *See Nemeti*, 472 N.W.2d at 480. On the contrary, Morato actively cooperated in the search, volunteering that the keys were in his pocket and identifying the particular key to unlock his vehicle. Morato's consent was voluntary; thus, the circuit court did not err in allowing the fruit of that search into evidence.[4]

### E.

[¶ 27.] Having affirmed the circuit court's suppression rulings, we are compelled to address Morato's sentences under the plain error rule and the doctrine allowing correction of a constitutional error. *See* SDCL 23A–44–15 (plain error rule); *State v. Nelson*, 1998 SD 124, ¶ 7, 587 N.W.2d 439, 443, *see also State v. Baker*, 440 N.W.2d 284, 292–93 (S.D.1989) (explaining our right to address constitutional questions sua sponte) (citations

omitted). Morato was sentenced to three concurrent sentences for violations listed under SDCL 22–18–1.1(1), SDCL 22–18–1.1(2) and SDCL 22–18–1.1(4). Such sentences are prohibited by *State v. Baker*, 440 N.W.2d at 293, which holds that SDCL 22–1–8–1.1 describes one offense that may be established four different ways. As Morato was subjected to multiple punishments for the same offense, his sentences were therefore unconstitutional. *See Baker*, 440 N.W.2d at 293. Multiple punishments for the same crime violate the constitutional prohibition against double jeopardy. Consequently, we reverse and remand for resentencing.[5]

[¶ 28.] Affirmed in part, and reversed and remanded in part.

[¶ 29.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.

---

4. Morato's other contentions that the search could not be justified under (1) the automobile exception, (2) the plain view doctrine, and (3) the inevitable discovery doctrine need not be reached in light of our decision on the consent issue.

5. We commend Assistant Attorney General Gary Campbell for bringing this sentencing error to the Court's attention.